COLORADO COURT OF APPEALS                    2016COA135

Court of Appeals No. 14CA0202
El Paso County District Court No. 12CR2114
Honorable Robert L. Lowrey, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Ryan Matthew Cardman,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE ROMÁN
Bernard, J., specially concurs
Berger, J., dissents

Announced September 22, 2016

Cynthia H. Coffman, Attorney General, Gabriel P. Olivares, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Katherine Brien, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 In *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981), the United States Supreme Court held that after a suspect invokes his right to counsel during custodial interrogation, the police may not subject him to further interrogation unless he "himself initiates further communication, exchanges, or conversations with the police."

¶ 2 This case presents the question of whether a suspect who has so invoked his Fifth Amendment right to counsel may reinitiate communication with the police through an agent, here, the suspect's wife, or whether reinitiation can occur only by direct contact between the suspect and the police. No Colorado appellate court has addressed this issue.

¶ 3 Following the lead of every federal and state appellate court that has decided this question to date, we hold that reinitiation may occur through an agent, but we also conclude that the police must have a reasonable belief that the suspect has, in fact, requested the agent to reinitiate contact between the suspect and the police.

¶ 4 Because the record here supports a finding that the police had a reasonable belief that defendant, Ryan Matthew Cardman, requested his wife to reinitiate contact with the police on his behalf

after he had invoked his right to counsel, we discern no constitutional error in admitting his inculpatory statements. Because we further conclude that defendant waived his claim of voluntariness at the suppression hearing, and discern no error in the trial court's admission of certain statements, we affirm.

## I.    Background

¶ 5      Defendant was convicted by a jury of multiple counts of sexual assault on a child and sentenced to concurrent indeterminate sentences of twelve years to life in prison.

¶ 6      When the victim was seven, she and her mother moved in with defendant, her mother's then-boyfriend.  The victim and her mother lived with defendant for about a year, and then the victim's mother became involved with another man, whom she later married.

¶ 7      Several years later, the victim told her stepfather that defendant had sexually assaulted her multiple times when she lived with him.  After the police were contacted, a forensic interview of the victim was conducted.  During her video-recorded forensic interview, which was admitted at trial, the victim alleged numerous instances of sexual contact between her and defendant.  The victim

also testified at trial that defendant had sexually assaulted her on multiple occasions.

¶ 8    The police executed a search warrant on defendant's home. They informed him the search was related to their suspicion of inappropriate activity on the Internet.  During the search, they recovered a weapon.

¶ 9    Defendant was arrested on the charge of possession of a weapon by a previous offender.  He promptly exercised his rights to remain silent and to counsel, and the police ceased questioning. But two days later, a police detective conducted another interview of defendant.  An audio recording of defendant's second police interview was admitted at trial.  In the interview, after initially denying any improper sexual contact with the victim, defendant admitted to three instances of sexual contact.

¶ 10    Before trial, defense counsel moved to suppress defendant's inculpatory statements on the basis that defendant had invoked his right to counsel and had never reinitiated discussions with the police.  The trial court denied the motion after a suppression hearing, finding that after the first interview but before the second

interview, defendant had communicated to the police through his wife a general willingness to talk about the investigation.

¶ 11     On appeal, defendant contends the trial court erred by (1) denying his motion to suppress on the grounds that he reinitiated communication with the police; (2) failing to sua sponte hold a hearing on the voluntariness of his confession; and (3) admitting statements made by the detective.

## II.     Third-Party Reinitiation Under *Miranda* and *Edwards*

¶ 12     Defendant contends the district court erred by not suppressing statements he made during his second custodial interrogation because he had previously invoked his right to counsel and did not himself reinitiate communication with the police.[1]  The People respond that defendant reinitiated contact with

---

[1] Defendant also contends that the police failed to scrupulously honor his invocation of his right to remain silent.  However, he does not further develop this contention, nor does he cite any supporting authority for it.  We do not address conclusory assertions of error presented without argument, analysis, or support.  *See, e.g., People v. Hill*, 228 P.3d 171, 176-77 (Colo. App. 2009).  Our discussion thus is limited to the rules that apply after a suspect has invoked his right to counsel, and we do not discuss whether, or to what extent, these rules, or different rules, apply after an invocation of the right to remain silent.

the police by directing a third party to reinitiate the communication. We agree with the People.

## A.    Standard of Review

¶ 13    Review of a trial court's decision whether to suppress a defendant's statements presents a mixed question of law and fact. *People v. Kutlak*, 2016 CO 1, ¶ 13.  We defer to the court's findings of historical fact if they are supported by sufficient evidence in the record, *People v. Rivas*, 13 P.3d 315, 320 (Colo. 2000), but we review de novo the court's ultimate legal conclusion — its application of legal standards to the facts of the case, *id.*; *see also People v. Bonilla-Barraza*, 209 P.3d 1090, 1094 (Colo. 2009).  In this respect, whether the facts found by the trial court show a reinitiation by defendant of police discussions under *Edwards* is a legal question that we review de novo.  *See, e.g., Holman v. Kemna*, 212 F.3d 413, 417 (8th Cir. 2000).  In conducting this review, we may look only at the evidence presented at the suppression hearing. *People v. Gomez-Garcia*, 224 P.3d 1019, 1022 (Colo. App. 2009).

## B.    Reinitiation of Contact with the Police

¶ 14    Pursuant to the Fifth Amendment of the United States Constitution and *Miranda v. Arizona*, 384 U.S. 436, 474 (1966),

once a defendant who is in custody requests counsel, all police-initiated interrogation must cease until he has consulted an attorney.

¶ 15    But "[a] suspect's request for the assistance of counsel is not irrevocable." *People v. Martinez*, 789 P.2d 420, 422 (Colo. 1990). In *Edwards*, the Supreme Court held that a suspect who has invoked his right to counsel must not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85; *see Martinez*, 789 P.2d at 422.[2]

¶ 16    In *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), the Court attempted to explain when a suspect "initiates" contact with the

_____

[2] The *Edwards* rule embodies two distinct inquiries. "[T]he 'initiation' question" is only "the first step of a two-step analysis" for determining whether a defendant's post-invocation statements made during custodial interrogation are admissible under *Miranda* and *Edwards*. *Oregon v. Bradshaw*, 462 U.S. 1039, 1048-49 (1983) (Powell, J., concurring in the judgment). The second step is determining whether the statements were preceded by a valid waiver of the defendant's previously asserted right to counsel. *Id.* at 1044-45; *see also Smith v. Illinois*, 469 U.S. 91, 95 (1984); *People v. Martinez*, 789 P.2d 420, 422 (Colo. 1990). Defendant does not dispute that he validly waived his *Miranda* rights at the start of his second police interview, and thus we do not address this step of the analysis.

police within the meaning of *Edwards*. A plurality of four justices held that a defendant reinitiates communication with the police where his comments "evince[] a willingness and a desire for a generalized discussion about the investigation" and are not "merely a necessary inquiry arising out of the incidents of the custodial relationship." *Id.* at 1045-46; *see Martinez*, 789 P.2d at 422; *People v. Pierson*, 670 P.2d 770, 775 (Colo. 1983).

¶ 17    According to the plurality, some inquiries,

> such as a request for a drink of water or a request to use a telephone . . . are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in *Edwards*.

*Bradshaw*, 462 U.S. at 1045.

¶ 18    However, the *Bradshaw* plurality held the suspect had reinitiated further conversation by asking an officer, "Well, what is going to happen to me now?" because that question, "[a]lthough ambiguous, . . . evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary

7

inquiry arising out of the incidents of the custodial relationship.  It could reasonably have been interpreted by the officer as relating generally to the investigation."  *Id.* at 1045-46.

¶ 19   The dissenting justices agreed that "to constitute 'initiation' under *Edwards*, an accused's inquiry must demonstrate a desire to discuss the subject matter of the criminal investigation." *Bradshaw*, 462 U.S. at 1055 (Marshall, J., dissenting).  The dissent, however, disagreed with the plurality's application because, in its opinion, the suspect's "question [could not] be considered 'initiation' of a conversation about the subject matter of the criminal investigation," but rather expressed merely a desire "to find out where the police were going to take him."  *Id.* at 1055-56.

¶ 20   The Colorado Supreme Court has applied the *Bradshaw* plurality's test to determine whether a suspect has reinitiated communication with the police, holding that "an accused must first initiate the conversation with the police and by his comments must 'evince[] a willingness and a desire for a generalized discussion about the investigation,' and not merely question the reasons for custody."  *Martinez*, 789 P.2d at 422 (alteration in original) (quoting *Bradshaw*, 462 U.S. at 1045-46).

¶ 21    The determination of whether a defendant's communication constitutes reinitiation with the police must be "based on the totality of the circumstances of the case, 'including the background, experience and conduct of the accused.'" *People v. Redgebol*, 184 P.3d 86, 99 (Colo. 2008) (quoting *Martinez*, 789 P.2d at 422).

### C.    Third-Party Reinitiation

¶ 22    Neither the United States Supreme Court nor the Colorado Supreme Court has addressed whether a suspect can reinitiate contact with the police under *Edwards* through a third party. Nonetheless, other courts have addressed the issue and "all support the validity of third-party communications." *Van Hook v. Anderson*, 488 F.3d 411, 419 (6th Cir. 2007); *see Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011); *Owens v. Bowersox*, 290 F.3d 960 (8th Cir. 2002); *United States v. Michaud*, 268 F.3d 728 (9th Cir. 2001); *Holman*, 212 F.3d 413; *United States v. Gonzalez*, 183 F.3d 1315 (11th Cir. 1999); *United States v. Murphy*, 133 F. Supp. 3d 1306 (D. Kan. 2015); *Ex parte Williams*, 31 So. 3d 670 (Ala. 2007); *Killingsworth v. State*, 82 So. 3d 716 (Ala. Crim. App. 2009), *rev'd on other grounds sub nom. Ex parte Killingsworth*, 82 So. 3d 761 (Ala. 2010); *State v. Yonkman*, 297 P.3d 902 (Ariz. 2013); *Dixon v.*

*State*, 751 S.E.2d 69 (Ga. 2013); *Harvell v. State*, 562 S.E.2d 180 (Ga. 2002); *In re Tracy B.*, 704 S.E.2d 71 (S.C. Ct. App. 2010).[3]

¶ 23    The leading case on this issue, and the one relied on by the trial court in its suppression order, is *Van Hook*, 488 F.3d 411, a split en banc decision of the Sixth Circuit.  *See, e.g., United States v. Santistevan*, 701 F.3d 1289, 1296 (10th Cir. 2012) (Tymkovich, J., dissenting) (stating that *Van Hook* contains "[t]he most elaborate discussion" of third-party reinitiation).

¶ 24    In *Van Hook*, 488 F.3d at 418, eight of the fifteen judges constituting the en banc court held that under *Edwards* and *Bradshaw*, whether the suspect's communication to the police "is direct or indirect is immaterial — what is important is [that] the

---

[3] Although some of these cases address the reinitiation of police discussions in the context of police interrogation after a defendant's Sixth Amendment right to counsel has attached, the "*Edwards* reasoning (including the exception for defendant-initiated conduct) also applies to Sixth Amendment cases." *People v. Ross*, 821 P.2d 816, 820 (Colo. 1992); *see also Owens v. Bowersox*, 290 F.3d 960, 962 (8th Cir. 2002) (citing *Michigan v. Jackson*, 475 U.S. 625, 629 (1986)).  Sixth Amendment cases addressing whether a defendant may reinitiate discussions with the police through a third party may therefore provide guidance in the context of the Fifth Amendment right to counsel.  *See, e.g., In re Tracy B.*, 704 S.E.2d 71, 76 (S.C. Ct. App. 2010) (a Sixth Amendment right to counsel case was relevant in deciding whether third-party reinitiation is permitted under the Fifth Amendment).

impetus for discussion comes from the suspect himself." There, the court ruled that the defendant had reinitiated contact with the police via his mother because (1) the detective spoke to the defendant's mother, who told the detective she had spoken with her son; (2) "based on that discussion, [the detective] thought that [the defendant] might want to talk to him"; (3) the detective contacted the defendant and told him he had talked with the defendant's mother; and (4) the defendant confirmed to the detective that he had talked with his mother and wanted to make a statement. *Id.* at 426.

¶ 25    The *Van Hook* majority explained that "permitting a suspect to communicate a willingness and a desire to talk through a third party is consistent with the interest protected by *Edwards*," which is preventing the police from "badgering defendants into waiving their asserted right to counsel through repeated questioning." *Id.* at 420 (citation omitted). Prohibiting a suspect from initiating discussions with the police through a third party would create "an artificial rule" not required by the Fifth Amendment, which is "not concerned with moral and psychological pressures to confess emanating from sources *other than* official coercion," such as

11

pressure from "friends or family members who convince [suspects] to talk with the police." *Id.* at 420-21 (citation omitted).

¶ 26    Noting the "importance of admissions of guilt in our criminal-justice system," the majority emphasized that "[c]ourts must not create 'wholly irrational obstacles to legitimate police investigative activity.'" *Id.* at 421 (quoting *Davis v. United States*, 512 U.S. 452, 460 (1994)).

¶ 27    Like *Van Hook*, decisions from other jurisdictions have held that allowing reinitiation through a third party does not violate *Edwards* because "the police are still prohibited from reinitiating questioning, and the impetus for reinitiation must still come from [the suspect]." *Williams*, 31 So. 3d at 683; *see also Michaud*, 268 F.3d at 737 ("*Edwards* and its progeny establish a clear line preventing police initiation. By the same token, however, these cases recognize that the [suspect] may change [his] mind and initiate communication. It is a factual question whether that is what occurred.").

¶ 28    The seven dissenting judges in *Van Hook* would have held that only the suspect's (or his attorney's) direct communication with the police may reinitiate discussions after he has invoked his right to

counsel. 488 F.3d at 428 (Cole, J., dissenting). The dissent argued that "[i]n addition to eviscerating *Edwards*, the majority's holding deviates from the clear import of the . . . Court's jurisprudence on custodial interrogations" by "endors[ing] the counter-intuitive proposition that we may treat a suspect as willing to talk to the police despite his silence to the police." *Id.* at 429-30.

¶ 29 The dissent also noted that because a suspect cannot invoke his right to counsel through a third party and "a proper initiation . . . is indispensable to finding a valid waiver" of the right to counsel, the majority's holding created a "paradox": "[a] third party who could not invoke the [suspect's] right to counsel may nonetheless play a crucial role in bringing about the waiver of that right." *Id.* at 435.

¶ 30 The *Van Hook* dissent further emphasized that the majority's holding eroded the "'bright-line' quality of the *Edwards* rule" that the Court has cited as one of its chief benefits: "[t]he merits of the *Edwards* decision . . . lies in the clarity of its command and the certainty of its application." *Id.* at 430-32 (alteration in original) (quoting *Minnick v. Mississippi*, 498 U.S. 146, 151 (1990)). According to the dissent, because of the potential uncertainty and

13

complexity in determining whether a third party's communication to the police constitutes a reinitiation by the suspect, the "hallmark 'clarity' and 'certainty of [] application' of the *Edwards* rule [would] be lost" under the majority's rule. *Id.* at 432, 434-35 (alteration in original) (quoting *Minnick*, 498 U.S. at 151).

¶ 31    We believe the majority's analysis in *Van Hook* (and the other federal and state cases) holding that, at least under some circumstances, reinitiation may occur through a third party is compelling, and we apply that rule here.

¶ 32    In so doing, we reject defendant's argument that the Court's language that reinitiation occurs only if "the [suspect] *himself* initiates further communication, exchanges, or conversations with the police," *Edwards*, 451 U.S. at 485 (emphasis added), means literally that only the suspect may communicate to the police that he wants to talk.

¶ 33    The Court in *Edwards* attempted to ensure that any statement made by a suspect during custodial interrogation was "not the result of coercive pressures" by "prevent[ing] police from badgering [the suspect] into waiving his previously asserted *Miranda* rights." *Minnick*, 498 U.S. at 150-51 (citation omitted); *see also Van Hook*,

14

488 F.3d at 420. *Edwards* is based on the presumption that after a suspect's invocation of the right to counsel, "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' [of custody and interrogation] and not the purely voluntary choice of the suspect." *Maryland v. Shatzer*, 559 U.S. 98, 104-05 (2010) (citation omitted).

¶ 34      But if a suspect reinitiates discussions with the police by asking a third party to inform the police that he wants to talk, there is no reason to assume that his subsequent waiver of the right to counsel was the result of coercive pressures or the badgering of the police. Under these circumstances, the suspect "evince[s] a willingness and a desire for a generalized discussion about the investigation," *Martinez*, 789 P.2d at 422 (citation omitted), and subsequent police interrogation does not violate *Edwards*.

¶ 35      Nonetheless, not all third-party communications to the police regarding whether the suspect will talk to them constitute "reinitiation" under *Edwards*. The *Van Hook* majority, 488 F.3d at 424-25, held that reinitiation of police discussions through a third party occurs "[w]hen the police receive information that a suspect

15

wants to talk; when there is a sufficient basis for believing its validity; and when the police confirm with the suspect the validity of that information."

¶ 36    We believe we can maintain *Edwards*' "'clear and unequivocal' guidelines to the law enforcement profession," *Minnick*, 498 U.S. at 151 (citation omitted), by applying a reasonableness standard to the *Van Hook* majority's test for third-party reinitiation.  Because "[t]he reasonableness standard provides law enforcement with a well-defined, common sense rule," the Court frequently applies the concept of a "reasonable police officer" in its Fifth Amendment jurisprudence.  *People v. Arroya*, 988 P.2d 1124, 1131 (Colo. 1999) (citing *Davis*, 512 U.S. at 461).

¶ 37    For instance, the Court held in *Davis* that to invoke the right to counsel during custodial interrogation, a suspect must "articulate his desire to have counsel present sufficiently clearly that a *reasonable police officer* in the circumstances would understand the statement to be a request for an attorney."  512 U.S. at 459 (emphasis added).  The Court explained that "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry."  *Id.* at 458-59.

16

¶ 38    Using this familiar "objective standard of a reasonable police officer under the circumstances" concept, *Arroya*, 988 P.2d at 1131, in conjunction with the Sixth Circuit's concept of "a sufficient basis for believing [the] validity" of the third party's communication to the police, *Van Hook*, 488 F.3d at 425, provides the protection necessary to avoid any evisceration of *Edwards*.

¶ 39    We thus hold that to establish that a suspect has reinitiated discussions with the police after previously invoking his right to counsel, the prosecution must show that (1) the police reasonably believed that the suspect directed a third party to inform them that he wanted to have "a generalized discussion about the investigation," *Martinez*, 789 P.2d at 422 (citation omitted); and (2) the police confirmed with the suspect that he had so indicated.

¶ 40    Both prongs of this test must be proven to establish reinitiation.  If the prosecution does not sufficiently establish the first prong, the fact that the suspect may have agreed to talk to a police officer after the officer "confirmed" the suspect's willingness to talk does not cure this failure.  Once the police contact the suspect, some of the protection of *Edwards* is already lost.  Without sufficient reinitiation by the suspect, we cannot assume that the

17

suspect's ultimate agreement to talk to the police is voluntary and not the result of the police "tak[ing] advantage of the mounting coercive pressures of 'prolonged police custody' by repeatedly attempting to question a suspect who previously requested counsel until the suspect is 'badgered into submission.'" *Shatzer*, 559 U.S. at 105 (citations omitted).

¶ 41     Regarding the third party's representations of the content of the suspect's communication with the third party, the prosecution must establish that the suspect's "comments . . . 'evince[d] a willingness and a desire for a generalized discussion [with the police] about the investigation.'" *Martinez*, 789 P.2d at 422 (quoting *Bradshaw*, 462 U.S. at 1045-46).

### D.     Application

### 1.     Additional Facts

¶ 42     The evidence at the suppression hearing consisted of testimony by the detective who conducted both interviews with defendant. The detective testified that after the victim's forensic interview, the police obtained a search warrant for defendant's house and informed defendant during the search that the warrant was based on some suspicions that he had engaged in

inappropriate activity or conduct on the Internet. During the execution of the warrant, the police found a handgun. Because defendant had a prior felony conviction, the detective asked defendant and his wife to come to the police station to discuss the gun.

¶ 43 The detective testified that the nature of the interview with defendant at the police station was, "[i]nitially, to discuss the finding of the weapon and him being a previous offender." He advised defendant of his *Miranda* rights, and defendant said that he understood them. He then asked defendant if he wished to talk to him, and defendant replied that he did not. Defendant then requested counsel and the interview ended, at which point defendant was arrested and taken into custody on the weapon offense.

¶ 44 Regarding the events that led up to the interview two days later at the jail, the detective testified that a Department of Human Services (DHS) caseworker had been in contact with defendant's wife regarding interviewing the couple's children. The detective testified that he had learned from the caseworker that "[defendant] and [defendant's wife] had questions." According to the detective's

testimony, he called defendant's wife, and "[i]n conjunction with that phone call, he learned that both [defendant] and [defendant's wife] had questions about the investigation."

¶ 45     At the suppression hearing, the following colloquy between the prosecutor and the detective occurred:

> Q. [Prosecutor:] Okay.  So I want to talk to you, then, about the conversation that you had with [defendant's wife] where she's indicating that [defendant and his wife] had some questions.  What did she say to you to indicate that there were some additional questions about the investigation?
>
> A. [Detective:] It was centered around the basis for the police department and DHS still being involved with them and the children and the reasons behind forensic interviews and justifications for that.
>
> Q. And how did [defendant's wife] indicate to you that [defendant] wanted to speak to you as well about these issues?
>
> A. I don't recall her exact words, but I had the understanding that she had been in conver -- she had been in contact with [defendant].  And [the DHS caseworker] advised me that they – [both defendant and his wife] had questions about the investigation and the reasons why we were still involved specifically with the children.
>
> . . .

20

> Q. So the information that you had received was that [defendant's wife] had been in contact with [defendant] and that they had some questions about -- both of them separately had some questions about what was going on with the investigation with regard to the children; is that correct?
>
> A. Correct.

¶ 46 On cross-examination, the detective confirmed he had received the information from not only the caseworker but also defendant's wife: "Q[:] [At] [s]ome point you receive information, between June 6th and June 8th, from -- directly from [defendant's wife] or through a third party that [defendant] wanted to -- was willing to speak to you about some questions he had?  A[:] Both."

¶ 47 The detective testified consistently on this point, stating during redirect examination that he made defendant aware, during the first interview, "that there was some interest in an Internet investigation or something related to the Internet."  The following then took place:

> Q. And it was after that time and after he had that awareness or you had made those statements that you received information that he wanted to speak with you?
>
> A. Correct.

21

Q. And that information, again, came from [defendant's wife]?

A. Correct.

## 2.    Analysis

¶ 48     In our view, the detective had a reasonable basis for believing that defendant had directed his wife (and also the caseworker) to inform the detective that defendant wanted to have a generalized discussion about the investigation.  He knew that defendant and defendant's wife were married, had previously been in contact with both of them, and understood that they had been in contact with one another after the first interview.  The detective's testimony was clear that defendant's wife informed him that defendant had questions about the investigation.  Further, the detective knew the DHS caseworker had also been in contact with defendant after the first interview, and she also informed him that both defendant and his wife had questions about the investigation.

¶ 49     Turning to the second step — whether the police confirmed the information with the suspect — the detective testified that after learning that defendant had questions about the investigation, he

called defendant at the jail and confirmed that defendant indeed desired to speak with him:

> Q. And when you made a phone call to talk to him, your testimony previously was you said you received information that he wanted to speak with you?
>
> A. Correct.
>
> Q. And he confirmed that that was, in fact, the case?
>
> A. Correct.
>
> . . .
>
> Q. But you initiated that contact because [defendant's wife] said, "He wants to talk to you"?
>
> A. Correct.

¶ 50     We conclude that defendant "adequately evinced a willingness and a desire to" reinitiate communication with the police through a third party because the detective received information that defendant had questions about the investigation, there was a reasonable basis for believing the validity of that information, and the detective confirmed with defendant the validity of that information.  *See Van Hook*, 488 F.3d at 424-26.

¶ 51    Similar to the facts in *Van Hook,* here (1) the detective spoke to defendant's wife, who told the detective she had spoken with defendant; (2) based on that discussion, the detective believed defendant had questions about the investigation; and (3) the detective then contacted the defendant and confirmed defendant wanted to talk.  *Id.* at 426.

¶ 52    Defendant contends the evidence shows he only had a willingness to talk, but not that he directed his wife to inform the detective that he wanted to talk to the police.  He further contends that the fact that he had "questions" does not establish that he had a desire to speak with the police about them.  But the record, and specifically the detective's testimony, belies this argument.  On redirect examination, the detective was asked: "But you initiated that contact [with defendant] because [defendant's wife] said, 'He wants to talk to you'?"  The detective answered unequivocally: "Correct."

¶ 53    No evidence in the record contradicts this point.  Defendant's wife presumably could have testified that defendant did not "direct" her to inform the detective that defendant wanted to talk.  The caseworker could have testified this way as well.  Even defendant

himself could have testified at the suppression hearing that he did not direct his wife to inform the detective that he wanted to speak with him about the investigation without implicating his Fifth Amendment privilege at trial. *See Simmons v. United States*, 390 U.S. 377, 394 (1968) (testimony by a defendant at a suppression hearing is not admissible against him at trial on the question of guilt). Thus, in our view, the evidence supports the district court's finding that defendant directed his wife to inform the detective that defendant wanted to talk with him.

¶ 54 Next, defendant contends that, even assuming his wife's statements established that he had a willingness and a desire to speak with the detective, the People failed to establish that such statements evinced, on the part of defendant, a "willingness and a desire for a generalized discussion about the *investigation*." *Martinez*, 789 P.2d at 422 (emphasis added) (citation omitted). Specifically, he argues that the evidence presented at the suppression hearing did not establish that he knew about the sexual assault investigation before the second interview, and therefore he could not have formed a willingness and a desire for a generalized discussion about it.

¶ 55    We believe this view takes the holding in *Bradshaw* too far.  In our view, defendant's comments "'evince[d] a willingness and a desire for a generalized discussion about the investigation,' and [were] not merely question[s] [regarding] the reasons for custody." *Martinez*, 789 P.2d at 422 (quoting *Bradshaw*, 462 U.S. at 1045-46).  The detective made defendant aware, during the initial search of the house and during the first interview, "that there was some interest in an Internet investigation or something related to the Internet."  And defendant's questions "could reasonably have been interpreted by the [detective] as relating generally to the investigation." *Bradshaw*, 462 U.S. at 1045-46.

¶ 56    It is not necessary that defendant knew the specific subject matter of the investigation.  It is enough that he was aware of *an* investigation, and that his subsequent decision to talk to police was unqualified. *See Colorado v. Spring*, 479 U.S. 564, 577 (1987).

> This Court's holding in *Miranda* specifically required that the police inform a criminal suspect that he has the right to remain silent and that *anything* he says may be used against him.  There is no qualification of this broad and explicit warning.  The warning, as formulated in *Miranda*, conveys to a suspect the nature of his constitutional privilege and the consequences of abandoning it.

26

> Accordingly, we hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.

*Id.*

¶ 57     After the *Spring* decision, the Court held in *Arizona v. Roberson*, 486 U.S. 675 (1988), that a suspect's invocation of the right to counsel prevented police officers from trying to speak with the suspect about a different investigation.  The Court explained the relationship of its new holding in *Roberson* with its holding in *Spring* as follows:

> Spring's decision to talk was properly considered to be . . . unqualified.  Conversely, Roberson's unwillingness to answer any questions without the advice of counsel, without limiting his request for counsel, indicated that he did not feel sufficiently comfortable with the pressures of custodial interrogation to answer questions without an attorney.  This discomfort is precisely the state of mind that *Edwards* presumes to persist unless the suspect himself initiates further conversation about the investigation; unless he otherwise states, there is no reason to assume that a suspect's state of mind is in any way investigation-specific.

*Roberson*, 486 U.S. at 684 (citations omitted).

27

¶ 58 Here, defendant knew the police wanted to talk to him about, at a minimum, the possession of a weapon by a previous offender charge and something "related to the Internet." With that knowledge, defendant informed the detective, via his wife, that he had questions about the investigation — specifically the reasons and justifications regarding the children being interviewed by DHS.

¶ 59 These inquiries were not merely related to the routine incidents of custody. *Bradshaw*, 462 U.S. at 1045-46. Rather, the questions concerned not only what DHS was doing but also *why* the children were being interviewed, and thus about the investigation itself.

## III. Voluntariness

¶ 60 A finding that defendant reinitiated communication with the police under *Miranda* does not necessarily end the inquiry. "Under the due process clauses of the United States and Colorado Constitutions, a defendant's statements must be made voluntarily in order to be admissible into evidence." *Effland v. People*, 240 P.3d 868, 877 (Colo. 2010); *see Mincey v. Arizona*, 437 U.S. 385, 398 (1978).

¶ 61 A trial court's findings of fact on the voluntariness of a statement will be upheld where they are supported by adequate evidence in the record. *Effland*, 240 P.3d at 878. However, the ultimate determination of whether a statement is voluntary is a legal question we review de novo. *Id.*

¶ 62 To be voluntary, a statement must be "the product of an essentially free and unconstrained choice by its maker." *People v. Raffaelli*, 647 P.2d 230, 234 (Colo. 1982) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

¶ 63 "A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement." *People v. Gennings*, 808 P.2d 839, 843 (Colo. 1991). Coercive governmental conduct may include physical abuse, threats, or psychological coercion. *Id.* at 843-44.

¶ 64 Whether a statement is voluntary must be evaluated on the basis of the totality of the circumstances under which it is given. *Effland*, 240 P.3d at 877. Relevant circumstances include: (1) "whether the defendant was in custody or was free to leave"; (2) "whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda*

rights"; and (3) "whether any overt or implied threat or promise was directed to the defendant." *Gennings*, 808 P.2d at 844. These considerations are not exclusive. *Id.*

¶ 65 "Threats and promises used by the interrogator factor into the analysis of voluntariness but are not conclusive. For such threats and promises to render a confession involuntary, they must have caused the defendant to confess, for example, where police have promised leniency in exchange for a confession . . . ." *People v. Wickham*, 53 P.3d 691, 695 (Colo. App. 2001).

¶ 66 The critical voluntariness inquiry is whether the individual's will has been overborne by the coercive behavior of law enforcement officials. *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); *People v. Humphrey*, 132 P.3d 352, 361 (Colo. 2006).

¶ 67 "Voluntariness is an objective inquiry reviewing the record for outwardly coercive police action, not a subjective analysis attempting to arbitrarily surmise whether the defendant perceived some form of coercive influence." *People v. Ferguson*, 227 P.3d 510, 513-14 (Colo. 2010).

¶ 68 "[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a

reliable and clear-cut determination that the confession was in fact voluntarily rendered." *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

¶ 69 "[T]he Constitution does not require a voluntariness hearing absent some contemporaneous challenge to the use of the confession." *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977); *People v. Sanchez*, 180 Colo. 119, 122, 503 P.2d 619, 621 (1972) ("We are not prepared to say that the mere act of offering the statement into evidence is sufficient to raise an issue of its voluntariness. The defendant must make his objection known to the court by objection, motion, cross-examination, or some other means during the course of the trial which indicates to the judge that there is an issue of admissibility of the statement." (quoting *Neighbors v. People*, 171 Colo. 349, 357, 467 P.2d 804, 808 (1970))).

¶ 70 Here, an audio recording of the second interview was played during trial. During that interrogation, the detective told defendant that if he admitted to some, but less than all, of the allegations, he could go home:

> [Detective:] [After a suspect invokes his right to counsel,] [o]ur department policy asks that we wait twenty-four hours before we re-contact the suspect and give him one last shot to say — hey, this is the information we've uncovered,

31

can you explain some things?  There is some gray area, and I just want to make sure that the stuff that happened is as much as she's talking about. . . .

[Detective:] Because we can — if we can provide an explanation to help this go away for you —

[Defendant:] I would love that.

[Detective:] So let's fix that.  Let's fix that.  Because right now, it's not going away. . . .

[Detective:] [I]f maybe you could meet [the victim] halfway on some of those things, that we can put the icing on the cake, put this in a drawer, have her go heal, have you turned around, get back with your wife, go to church, live your life, and put all of this behind you, right now today.

[Defendant:] I would love that, you have no idea.

[Detective:] Then let's do it. . . .

[Detective:] We both know where you wanna go in life and with your wife and church and everything.  I'm not here to hang you, I'm not here to beat you up today.  I'm here to do this [sounds of paper shuffling].  At the end of this sentence, I put this in a drawer.  And I can't do that if you tell me that you had sex with this girl fifty, sixty times, I'm concerned.  And then I have a different investigation.  If there was some inappropriate sexual stuff that happened once or twice, I want an explanation for that so I can do this [sounds of paper shuffling], so I can go home on my Friday, do you

32

understand?  I'm trying to paint the picture, man.

[Defendant:] If I can get this all figured out, closed out, just done with, I can go home tomorrow.

[Detective:] Let's do it.

[Defendant:] That's what I want to do.

[Detective:] And if I can help with any of that here, I'd — you're damn skippy. . . .

[Detective:] Because I honestly think that if you can provide some sort of corroboration and some answers, maybe [inaudible] an apology or quick sorry for whatever it is, and I give that to [the victim], I think that would go away. . . .

[Detective:] What we don't want to hear is that Ryan Cardman wakes up over here every day and lusts for sexual contact with a kid.  And there's fifty, sixty times like what's she's saying.  We don't want to hear that.  But what is explainable and what people understand is . . . there was an accident, a momentary, one-time lapse and a bad decision occurred.  People understand that, okay?  What people don't understand is this guy over here who wakes up every day to wait 'til she's alone, 'til you're alone, to do those things.  That guy is the one we're worried about.  That's the guy that we try to send to prison and to lock up

> and that's what I want to eliminate here today.
> And, Ryan, I don't think you're that guy.[4]

¶ 71    Defendant contends that statements he made in the second interview were not voluntary and argues the trial court erred by not sua sponte holding a hearing on the issue of the voluntariness of the statements. We are troubled by the police interrogation tactics used in this case; however, we do not reach the merits of the voluntariness issue because defendant waived it by not raising it during the suppression hearing.

¶ 72    Defendant acknowledges that he did not raise this issue at the suppression hearing but urges us to review the issue anyway under a plain error standard of review. We acknowledge that the supreme court as well as divisions of this court have reached different conclusions regarding whether a failure to contemporaneously object on constitutional grounds results in the issue being reviewed for plain error. *Compare, e.g.*, *People v. McMurtry*, 122 P.3d 237, 241 (Colo. 2005) (a defendant may not raise claim of denial of constitutional right to speedy trial for the first time on appeal),

---

[4] There is no transcript of the interview in the record, and the audio recording is very difficult to understand. The excerpts quoted are our best approximation of what was said based on the audio recording.

34

*People v. Cooper*, 205 P.3d 475, 478 (Colo. App. 2008) (declining to consider unpreserved double jeopardy claims), *and People v. Kitsmiller*, 74 P.3d 376, 378 (Colo. App. 2002) (declining to review unpreserved due process claim that the defendant was entitled to an evidentiary hearing), *with, e.g., People v. Miller*, 113 P.3d 743, 749-50 (Colo. 2005) (reviewing for plain error the defendant's due process claim regarding instructional error), *People v. Kruse*, 839 P.2d 1, 3 (Colo. 1992) (applying plain error standard to Fifth Amendment argument and stating it is an exception to rule that claim must first be brought in trial court), *and People v. Tillery*, 231 P.3d 36, 47 (Colo. App. 2009) (applying plain error review to unpreserved claim of double jeopardy sentencing errors), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo. 2011).

¶ 73     Because we conclude defendant waived his right to a hearing on voluntariness, we need not wade into this dispute.

¶ 74     "Waiver is defined as the 'intentional relinquishment or abandonment of a known right.'" *Hinojos-Mendoza v. People*, 169 P.3d 662, 668 (Colo. 2007) (quoting *United States v. Olano*, 507 U.S.

35

725, 733 (1993)). And, unlike a right that is merely forfeited, "there is no appeal from a waived right." *Id.*[5]

¶ 75    Although defendant moved to suppress the incriminating statements, he chose to do so *solely* on the basis that he did not reinitiate communication with the police, not because his statements were involuntary. The court held a two-day suppression hearing. Defendant failed to raise voluntariness at any time during the suppression hearing.[6]

¶ 76    On appeal, defendant does not argue that he was unaware of the requirements that a statement must be voluntary to be

---

[5] "Invited error is akin to waived error. Invited error obviously should not be reviewable for plain error." *People v. Greer*, 262 P.3d 920, 937 n.7 (Colo. App. 2011) (J. Jones, J., specially concurring) (citations omitted).

[6] This is not equivalent to a failure to contemporaneously object to something during the heat of a trial. Defendant moved to suppress the incriminating statements, but only on the basis that he had not reinitiated contact with the police. Defendant cannot now collaterally attack the voluntariness of those statements by seeking remand for a voluntariness hearing. Remanding the case for the trial court to hold a hearing on whether the statements were voluntary would create an incentive for defendants to forgo raising the issue of voluntariness and then to seek remand on appeal if found guilty at trial. To hold otherwise would allow defendants to roll the dice at the first trial (particularly where, as here, the defendant is a felon who would likely not testify at trial and thus where the only chance for the jury to see his denial of the charges is in the videotaped interrogation) and only after being found guilty seek suppression on different grounds than those raised initially.

36

admissible or that he request a voluntariness hearing. Rather, he contends he raised the issue of voluntariness during opening and closing statements at trial.

¶ 77 We disagree with defendant that the remarks made during opening and closing statements were sufficient to raise the issue and warrant a hearing under *Jackson v. Denno*, 378 U.S. 368 (1964).[7] This is because "[w]e must limit our review to the evidence presented at the suppression hearing." *Gomez-Garcia*, 224 P.3d at 1022. Defendant cites no authority for the proposition that a trial court has a duty to sua sponte hold a hearing on the issue of voluntariness where the arguably coercive police tactics become apparent *during trial* as opposed to during the suppression hearing.

¶ 78 To require the trial court to hold a hearing on the voluntariness of a defendant's statements where the issue first becomes apparent during the trial would be overly burdensome and inefficient. In the context of this case, such an obligation could

---

[7] In *Jackson v. Denno*, 378 U.S. 368, 374 & n.4 (1964), defense counsel raised the issue with the trial court by directly informing the court that the defendant "was in no mental condition to make the statement" at issue and received acknowledgment from the court that it understood counsel to be "questioning the circumstances under which [the defendant] was interrogated."

have required the trial court, after the audio recording of the confession had been played for the jury, to sua sponte (1) declare a mistrial; (2) order a new suppression hearing on the issue of voluntariness; (3) convene a new jury; and (4) begin a new trial (where the confession may even have been allowed).[8]

¶ 79 Defendant relies on *Jackson* for the proposition that a trial court has a duty to sua sponte hold a hearing on the issue of voluntariness absent an express objection by a defendant where it should be evident to the trial court that voluntariness is an issue.

¶ 80 However, the defendant in *Jackson* raised the issue with the trial court; although he "did not specifically object to the admission of the confession initially, the trial court indicated its awareness that Jackson's counsel was questioning the circumstances under which Jackson was interrogated." 378 U.S. at 374. The Court in *Jackson* even quoted the colloquy between the trial court and Jackson's attorney, during which counsel objected to the use of the

---

[8] Moreover, were the trial court to sua sponte declare a mistrial, defendant would undoubtedly raise the issue of double jeopardy. *People v. Espinoza,* 666 P.2d 555, 558 (Colo. 1983) ("A mistrial declared without the consent and over the objection of the defendant invokes double jeopardy protection to bar retrial unless 'manifestly necessary' to preserve the public interest in a fair trial and a just verdict.").

confession and explained to the court "[the defendant] was in no mental condition to make the statement."  *Id.* at 374 n.4.

¶ 81    Here, no such colloquy occurred at trial (and certainly not at the suppression hearing) between the court and defendant's counsel that would have indicated defendant's objection on voluntariness grounds or the trial court's awareness that defendant was questioning the voluntariness of his statements.

¶ 82    Moreover, in *Wainwright* the Supreme Court explicitly rejected the very argument defendant makes here:

> Respondent also urges that a defendant has a right under *Jackson v. Denno* to a hearing as to the voluntariness of a confession, even though the defendant does not object to its admission.  But we do not read *Jackson* as creating any such requirement.  In that case the defendant's objection to the use of his confession was brought to the attention of the trial court, and nothing in the Court's opinion suggests that a hearing would have been required even if it had not been.  To the contrary, the Court prefaced its entire discussion of the merits of the case with a statement of the constitutional rule that was to prove dispositive that a defendant has a "right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness . . . ."  *Language in subsequent decisions of this Court has reaffirmed the view that the Constitution does*

> *not require a voluntariness hearing absent some*
> *contemporaneous challenge to the use of the*
> *confession.*

433 U.S. at 86 (emphasis added) (citations omitted).

¶ 83    Thus, a defendant must request a hearing on the issue of

voluntariness in order for the court to hold one. *Id.*; *Lego*, 404 U.S.

at 489; *Sanchez*, 180 Colo. at 122, 503 P.2d at 621. Defendant did

not request such a hearing.

¶ 84    Accordingly, we conclude that because defendant moved to

suppress the statements, but did so solely on reinitiation grounds,

he waived the voluntariness claims. We therefore discern no error.

*See People v. Staton*, 924 P.2d 127, 133 (Colo. 1996) (To preserve a

suppression issue for appeal, where other grounds for suppression

are stated in the motion to suppress, defendant "must have stated

[the issue] initially as a ground for his motion to suppress."); *People*

*v. Salyer*, 80 P.3d 831, 835 (Colo. App. 2003) (argument on appeal

that the district court erred in denying motion to suppress on

voluntariness grounds was waived where the defendant did not

raise that argument in the district court but raised other

suppression arguments); *People v. Greer*, 262 P.3d 920, 937 (Colo.

App. 2011) (J. Jones, J., specially concurring) ("If a defendant in a

40

criminal case waives an error in the trial court — i.e., intentionally relinquishes or abandons a known right — he waives any right to plain error review on appeal.").

## IV.    Detective's Statements on Credibility

¶ 85    Defendant next argues that reversal is required because the recording of the interview admitted at trial included the detective's assertions that he believed the victim and did not believe defendant's denials of the victim's allegations, and because the detective testified that he did not believe defendant.

¶ 86    Defendant did not object to the admission of this evidence.  We therefore review the issue for plain error.  *People v. Lopez*, 129 P.3d 1061, 1064 (Colo. App. 2005).

¶ 87    Plain error addresses error that is both "obvious and substantial."  *Miller*, 113 P.3d at 750.  Under the plain error standard, "the defendant bears the burden to establish that an error occurred, and that at the time the error arose, it was so clear cut and so obvious that a trial judge should have been able to avoid it without benefit of objection."  *People v. Conyac*, 2014 COA 8M, ¶ 54; *People v. Ujaama*, 2012 COA 36, ¶ 42.  "The defendant must also establish that the error was so grave that it undermined the

41

fundamental fairness of the trial itself . . . as to cast serious doubt on the reliability of the conviction." *Conyac*, ¶ 54.

¶ 88    In *Davis v. People*, 2013 CO 57, ¶¶ 1, 17, the Colorado Supreme Court held that a law enforcement officer may testify about his perception of a witness's credibility during an investigative interview if the testimony is offered to provide context for the officer's interrogation tactics and investigative decisions rather than as a comment on the witness's credibility. It necessarily follows that similar statements by police officers made during the interrogation itself are admissible for the same purpose.

¶ 89    Here, the statements made by the detective during the interview fall within the purview of *Davis*. The detective told defendant numerous times during the interview that he did not believe him after defendant had denied certain sexual contact with the victim, and the detective also said that he believed at least some of the victim's allegations. And the detective testified at trial that he used these statements as an interrogation technique.

¶ 90    Moreover, except for two statements by the detective during his testimony that may have crossed the line into impermissible

commentary on defendant's credibility,[9] all of the detective's testimony was permissible under *Davis*. These two questionable statements, if error, were neither so obvious that the trial judge "should have been able to avoid [them] without benefit of objection," nor so grave as to undermine "the fundamental fairness of the trial itself . . . as to cast serious doubt on the reliability of the conviction." *Conyac*, ¶ 54.

¶ 91    Accordingly, we discern no plain error.

V.    Conclusion

¶ 92    The judgment is affirmed.

JUDGE BERNARD specially concurs.

JUDGE BERGER dissents.

---

[9] These statements were: (1) the detective's testimony that he "essentially told [defendant] that [he] didn't believe him" when defendant denied any sexual contact with the victim because of the detective's "own gut feeling in the way that [defendant] was answering questions of known facts versus questions of [the victim]'s allegations"; and (2) the detective's testimony that after defendant began to admit some sexual contact with the victim, the detective "felt most of the information [defendant] was giving . . . to [him] was genuine."

JUDGE BERNARD, specially concurring.

¶ 93    I concur in full with the majority opinion. I write separately as far as Part III is concerned to provide additional reasons for why I respectfully disagree with the dissent's conclusion that we should review "the voluntariness question for plain error."

¶ 94    It is my view that, for the following reasons, plain error review in this case would be ineffective and unfair to the prosecution.

¶ 95    First, our supreme court has made clear that, to make "meaningful appellate review" possible, a trial court must "make sufficiently clear and detailed findings of fact and conclusions of law *on the record*" before it "may rule that a confession is voluntary and admissible, or that it is involuntary and must be suppressed[.]" *People v. McIntyre*, 789 P.2d 1108, 1110 (Colo. 1990). "By failing to present [his] claims" to the trial court, defendant "effectively prevented the court from making factual findings that would be germane to the disposition" of those claims. *United States v. Hamilton*, 587 F.3d 1199, 1216 n.9 (10th Cir. 2009). And we obviously cannot make such factual findings on appeal. *See People v. A.W.*, 982 P.2d 842, 852 (Colo. 1999)("Appellate courts are not empowered to make factual findings[.]").

¶ 96    Second, when a defendant does not file a motion to suppress, the prosecution "may justifiably conclude that it need not introduce the quality or quantity of evidence needed otherwise to prevail." *United States v. Chavez-Valencia,* 116 F.3d 127, 132 (5th Cir. 1997); *accord United States v. Burke,* 633 F.3d 984, 990 (10th Cir. 2011); *United States v. Rose,* 538 F.3d 175, 183 (3d Cir. 2008).  So, if we were to review defendant's contention for plain error, the prosecution would be "forced on appeal to rely on an underdeveloped record in defending itself from the suppression argument."  *Rose,* 538 F.3d at 182; *accord Burke,* 633 F.3d at 990; *Chavez-Valencia,* 116 F.3d at 132.

JUDGE BERGER, dissenting.

¶ 97 I agree with the majority that a suspect may reinitiate contact with the police through a third party after first invoking his Fifth Amendment right to counsel. I also agree with the majority that the police must have a reasonable belief that the third party has been authorized by the suspect to reinitiate contact with the police.

¶ 98 But I respectfully dissent from the majority's application of these principles. Instead, I believe this record demonstrates that the officer did *not* have a reasonable belief that Cardman wanted to reinitiate contact with the police and engage in a generalized discussion about the investigation. Therefore, the admission of numerous inculpatory statements made by Cardman during the ensuing unconstitutional interrogation violated *Edwards v. Arizona,* 451 U.S. 477 (1981), and thus the Fifth Amendment. And, on this record, the improper admission of this evidence was not harmless beyond a reasonable doubt, requiring reversal of Cardman's convictions.

¶ 99 I also dissent from the majority's refusal to address, even under a plain error standard, the voluntariness of Cardman's inculpatory statements that were admitted at trial. In my view, this

46

record demonstrates a substantial question regarding the voluntariness of those statements and thus raises substantial questions regarding the reliability of Cardman's convictions.[1]

### I. Reinitiation of Communications With the Police: This Record Does Not Support a Finding and Conclusion that Cardman Reinitiated Communications With the Police

¶ 100    For four reasons, I reject the trial court's (and majority's) determination that Cardman reinitiated communications with the police through his wife.

¶ 101    First, the People must prove that Cardman reinitiated communications with the police by clear and convincing evidence. *See People v. Redgebol*, 184 P.3d 86, 99 (Colo. 2008).  They did not meet this burden.

¶ 102    When the detective was given an opportunity at the suppression hearing to explain the circumstances that led him to contact Cardman after Cardman had invoked his rights to silence and counsel, the detective testified as follows:

> Q. Could you describe for the Court what are the circumstances that led you to, once again, speak with Mr. Cardman?

---

[1] I agree with Part IV of the majority's opinion, "Detective's Statements on Credibility."

A. As I said before, myself and assigned DHS Caseworker Patricia Hartman had been in contact with Mrs. Cardman in reference to screening interviews of their children or if there were to be forensic interviews completed with the children. During those several phone calls between DHS Caseworker Mrs. Hartman and Mrs. Cardman, it was obvious there was [sic] questions in reference to my part in my investigation, to include some property we obtained from the search warrant I had been given back from our computer forensics unit, and I was able to return that back to the Cardmans. In conjunction with that phone call, I learned that both Mr. and Mrs. Cardman had questions about the investigation.

Q. Okay. And I just -- I kind of want to flush that out a little bit, then. You referenced that there was some evidence that had been seized and that it sounds like the Cardmans or [Mrs.] Cardman was interested in getting that evidence back.

A. Correct. They both were.

Q. Okay. And that evidence was what?

A. It was a -- it was an Asus tablet, which is similar to an iPad. It was a larger mini-laptop-looking thing.

Q. And also while this was going on, there's a separate issue, which is that there's the possibility that the Colorado Springs Police Department or others would like to complete a forensic interview with the Cardmans' two children; correct?

A. Correct.

48

Q. And there were questions about that interview process?

A. Correct.

Q. And this was an interview that was taking place in conjunction with your investigation?

A. Correct.

Q. And you spoke with [Mrs. Cardman] about these issues; is that correct?

A. DHS Caseworker Hartman spoke to her about these issues. And I learned from Caseworker Hartman that Mr. and Mrs. Cardman had questions. I would -- I don't know what they were. I eventually talked to Mrs. Cardman, and she explained they had questions, I'm assuming, about that. And I called her to tell her I could bring back the Asus tablet and answer their questions that they had.

Q. Okay. So I want to talk to you, then, about the conversation that you had with [Mrs.] Cardman where she's indicating that they had some questions. What did she say to you to indicate that there were some additional questions about the investigation?

A. It was centered around the basis for the police department and DHS still being involved with them and the children and the reasons behind forensic interviews and justifications for that.

Q. And how did she indicate to you that Ryan Cardman wanted to speak to you as well about these issues?

49

A. I don't recall her exact words, but I had the understanding that she had been in conver -- she had been in contact with Mr. Cardman. And Mrs. Hartman advised me that they -- the Cardmans had questions about the investigation and the reasons why we were still involved specifically with the children.

. . .

Q. So the information that you had received was that [Mrs. Cardman] had been in contact with Ryan and that they had some questions about -- both of them separately had some questions about what was going on with the investigation with regard to the children; is that correct?

A. Correct.

Q. And did you receive any information that there was any other reason that Mr. Cardman wanted to talk to you, whether it be about evidence or any other part of the investigation?

A. No.  From what I recall, the phone call was very brief.  And I had informed Mrs. Cardman that I had received the Asus tablet back from the computer forensics unit; and I can bring that back to her and then cover in more detail what her concerns were.  So we didn't discuss specifics over the phone call.

Q. And so once we've received the information from – from [Mrs.] Cardman, which is Ryan's wife, did you then initiate some contact with Mr. Cardman?

A. Yes.  Having the information Mr. Cardman may have questions about the current status -

- I was actually on an unrelated investigation at that moment in the field. I placed a phone call to CJC and was actually routed to Mr. Cardman's ward and asked him if I came down there, if he was gonna talk to me, and he said he would.

¶ 103     In my view, this testimony does not support a finding, by clear and convincing evidence, that Cardman, through his wife, was requesting the police to recontact him. Only later in the suppression hearing, when the prosecutor asked a series of leading questions — the premises of which were inconsistent with the detective's prior narrative testimony — did the detective utter the testimony the majority relies on to find that Cardman reinitiated contact with the police.

¶ 104     There is a reason that an elevated standard of proof applies to this inquiry, and I would not countenance the avoidance of that standard of proof by reliance on the types of inconsistent, leading questions and answers given after the detective gave narrative testimony that disproved reinitiation by Cardman.

¶ 105     Second, even if we were to assume that Cardman's wife's statements to the detective established that Cardman had not only a willingness but also a desire to speak with the detective, nothing

51

in the record shows that such statements evinced, on the part of Cardman, a "willingness and a desire for a generalized discussion about the *investigation*." *People v. Martinez*, 789 P.2d 420, 422 (Colo. 1990) (emphasis added) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)). Although the trial court found that Cardman's communications with the police established that Cardman was "willing" to talk to the detective, there is no evidence (other than the detective's agreement with the prosecutor's leading questions on redirect) that the detective reasonably believed that Cardman directed his wife to inform the detective that he *wanted* to talk to the police. Willing and wanting are not the same thing.

¶ 106    The fact that Cardman may have had "questions" does not establish that he had any desire *to speak to the police* about those questions. Anyone in Cardman's position would have "questions" about any number of things: what he was being charged with, the future course of his life, the effect of his arrest on his family, and numerous other subjects. But none of these "questions" necessarily indicates that Cardman wanted to speak with the *detective* about any or all of these matters, particularly after previously clearly invoking his right to silence and to counsel. The

52

presumption raised by Cardman's request for counsel, "that he consider[ed] himself unable to deal with the pressures of custodial interrogation without legal assistance," *Arizona v. Roberson*, 486 U.S. 675, 683 (1988), did not disappear simply because the detective learned that Cardman had "questions."

¶ 107 Third, the evidence presented at the suppression hearing did not establish that Cardman knew about the sexual assault investigation before the second interview. Without any knowledge regarding the subject of the investigation, Cardman could not possibly have had a willingness and a desire for a generalized discussion about it.

¶ 108 I disagree with the majority that "[i]t is not necessary that [Cardman] knew of the specific subject matter of the investigation" as long as he was "aware of *an* investigation." As the United States Supreme Court explained in *Edwards*, while a defendant, after initially being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), may validly waive his rights and respond to interrogation, "the Court has strongly indicated that additional safeguards are necessary when [the defendant] asks for counsel." *Edwards*, 451 U.S. at 484. Consequently, although, as the majority

emphasizes, a defendant need not know "all the possible subjects of questioning" to validly waive his *Miranda* rights initially, *Colorado v. Spring*, 479 U.S. 564, 577 (1987), the analysis changes once the defendant invokes his Fifth Amendment right to counsel.

¶ 109    "[C]ourts [must] indulge . . . every reasonable presumption against [a] waiver" of constitutional rights, *Brewer v. Williams*, 430 U.S. 387, 404 (1977), and reinitiation by the suspect is a prerequisite to a valid waiver of the suspect's previously asserted Fifth Amendment right to counsel, *see Edwards*, 451 U.S. at 484-85.  Ironically, the majority relies on *Arizona v. Roberson*, 486 U.S. 675 (1988), which held that a defendant's invocation of his Fifth Amendment rights extends to all cases for which the defendant is under investigation, to support its conclusion that waiving the right to counsel also applies to multiple cases.  Thus, the majority relies on a case that *extends* Fifth Amendment protections to a suspect as support for a waiver of those very rights.

¶ 110    Fourth, the fact that Cardman told the detective on the phone that he would talk to him does not establish that the detective confirmed with Cardman that Cardman intended, through his wife, to reinitiate discussions with the police.  Without such

54

confirmation, and without any other evidence in the record that shows that Cardman intended to initiate contact with the detective, we cannot be sure that Cardman's subsequent waiver of the right to counsel was "purely [his] voluntary choice" and not the result of coercive pressures. *Maryland v. Shatzer*, 559 U.S. 98, 104-05 (2010) (quoting *Roberson*, 486 U.S. at 681). Under these circumstances, concluding that Cardman reinitiated contact with the police violates *Miranda* and *Edwards*.

¶ 111    The majority discusses only the detective's responses to leading questions by the prosecutor on direct examination regarding the detective's phone call with Cardman:

> Q. And when you made a phone call to talk to him, your testimony previously was you said you received information that he wanted to speak with you?
>
> A. Correct.
>
> Q. And he confirmed that that was, in fact, the case?
>
> A. Correct.

¶ 112    The majority, however, omits the exchange that immediately followed this dialogue:

> Q. And that he wanted to speak with you about aspects of the investigation?

A. It was over the phone call. It was just whether or not if I came down there, he would — he would talk to me.

¶ 113    The majority also omits the following portion of the detective's testimony on direct about his phone call with Cardman:

A. . . . I placed a phone call to . . . Mr. Cardman[] . . . and . . . asked him if I came down there, if he was gonna talk to me, and he said he would.

Q. And when you spoke with Mr. Cardman by phone, did you make reference to the fact that you had received information he wanted to speak to you?

A. Yes.

Q. And what was his response to that?

A. He said he would talk to me.

¶ 114    I cannot agree with the majority that this testimony establishes, by clear and convincing evidence, that Cardman confirmed that he had directed his wife to contact the police and inform them that he wanted to speak with them. It may show that he was "willing" to talk to the detective, but it does not show that the "impetus" for the subsequent interrogation came from Cardman himself. *See Van Hook v. Anderson,* 488 F.3d 411, 418 (6th Cir. 2007) (en banc).

¶ 115    To permit the police to re-interrogate a defendant after the

defendant has previously invoked his right to counsel, the

information the police obtain from a third party should be the

substantial equivalent of direct initiation by the defendant: it

should convey the same message as if the defendant himself had

contacted the police and said that he wanted to talk about his case.

Vague information that Cardman's wife had spoken with him and

learned he had "questions" does not convey such a message.

¶ 116    For these reasons, the interrogation of Cardman and the

admission into evidence of Cardman's statements to the police

(made after he had invoked his right to counsel) violated Cardman's

rights under the Fifth Amendment to the United States

Constitution.

¶ 117    It is not a close question whether the improper admission of

Cardman's statements requires reversal.  Other than Cardman's

statements, the only evidence presented at trial that he committed

the offenses was the victim's testimony, the statements she made in

her forensic interview, and the testimony of other witnesses

regarding statements she had made to them.

¶ 118     Although the victim described a few instances of sexual contact with Cardman that were similar to those Cardman discussed in his statements, much of her testimony contained numerous details that were not corroborated by Cardman's statements or by any other evidence.  Indeed, much of her testimony contradicted what she had said in her initial disclosures.

¶ 119     For instance, Cardman consistently denied any instances of genital penetration.  The victim initially said in her forensic interview that Cardman had forced her into oral sex, but she expressly denied any vaginal or anal intercourse.  However, at trial she testified that Cardman had penetrated her vagina and anus with his penis multiple times.

¶ 120     The victim also testified that Cardman had physically abused her by, among other things, hitting her in the face with a gun, cutting the bottom of her feet and burning her with a heated-up pocket knife, and making her submerge her hands in boiling water for as long as she could stand it.  She also testified that Cardman carved the word "slut" into her leg with a knife, which caused her to lose consciousness for at least twenty minutes and bleed so much

that her dogs were "covered in blood," leaving a scar that lasted for three years.

¶ 121    However, the victim did not disclose any of these events until many months after her initial disclosures. Even more significantly, her mother, who was a nurse, testified that she never saw *any* unexplained injuries on the victim while they were living with Cardman.

¶ 122    For these reasons, Cardman's convictions should be reversed and the case remanded for a new trial.

## II. Voluntariness of Cardman's Inculpatory Statements: This Record Raises a Substantial Question Whether Cardman's Inculpatory Statements Were Voluntary and the Case Should Be Remanded to Make the Voluntariness Determination

¶ 123    Having incorrectly concluded that Cardman reinitiated contact with the police, the majority then declines on procedural grounds to address whether Cardman's statements made during the prohibited reinitiated interrogation were voluntary.

¶ 124    I agree with the majority that Cardman did not directly raise this issue in the trial court, but I disagree with the majority that Cardman is procedurally barred from *any* review of the voluntariness of his statements. Instead, I believe that we should

review the voluntariness question for plain error and that our failure to do so raises serious questions regarding the reliability of Cardman's convictions.

¶ 125    Short of physical torture, I cannot imagine police tactics that are more likely to lead to false confessions, and thus wrongful convictions, than the conduct engaged in by the police in this case. The facts are stark: a person is being questioned by the police regarding extremely serious crimes, the penalty for which is an effective life sentence and societal opprobrium that we judges can hardly imagine.  The police officer tells the suspect — no, *promises* the suspect — that if he admits to what the officer characterizes as relatively minor crimes (without telling the suspect that these relatively minor crimes also could well result in an effective life sentence) he can go home to his wife and child and no charges will be filed.  The majority acknowledges in the abstract that promises of this type may constitute coercive conduct by the police and support a conclusion that inculpatory statements made in reliance upon such promises are involuntary.  But nevertheless, for procedural reasons, the majority refuses to address this police conduct.

¶ 126    The statements of the detective during his interrogation of Cardman illustrate far better than my characterizations the nature and risks of the tactics used by the police to coerce Cardman's confession[2]:

> [Detective:] [After a suspect invokes his right to counsel,] [o]ur department policy asks that we wait twenty-four hours before we re-contact the suspect and give him one last shot to say — hey, this is the information we've uncovered, can you explain some things?  There is some gray area, and I just want to make sure that the stuff that happened is as much as she's talking about. . . .
>
> [Detective:] Because we can — if we can provide an explanation to help this go away for you —
>
> [Cardman:] I would love that.
>
> [Detective:] So let's fix that.  Let's fix that. Because right now, it's not going away. . . .
>
> *[Detective:] [I]f maybe you could meet [the victim] halfway on some of those things, that we can put the icing on the cake, put this in a drawer, have her go heal, have you turned around, get back with your wife, go to church, live your life, and put all of this behind you, right now today.*

---

[2] This is not a case in which the trial court did not hear evidence regarding the coercive tactics used by the police.  All of it was on full display during the trial despite the fact that Cardman did not expressly raise the voluntariness issue in his motion to suppress or at the suppression hearing.

*[Cadman:] I would love that, you have no idea.*

*[Detective:] Then let's do it. . . .*

*[Detective:] We both know where you wanna go in life and with your wife and church and everything. I'm not here to hang you, I'm not here to beat you up today. I'm here to do this [sounds of paper shuffling]. At the end of this sentence, I put this in a drawer. And I can't do that if you tell me that you had sex with this girl fifty, sixty times, I'm concerned. And then I have a different investigation. If there was some inappropriate sexual stuff that happened once or twice, I want an explanation for that so I can do this [sounds of paper shuffling], so I can go home on my Friday, do you understand? I'm trying to paint the picture, man.*

*[Cardman:] If I can get this all figured out, closed out, just done with, I can go home tomorrow.*

*[Detective:] Let's do it.*

*[Cardman:] That's what I want to do.*

[Detective:] And if I can help with any of that here, I'd — you're damn skippy. . . .

[Detective:] Because I honestly think that if you can provide some sort of corroboration and some answers, maybe [inaudible] an apology or quick sorry for whatever it is, and I give that to [the victim], I think that would go away. . . .

[Detective:] What we don't want to hear is that Ryan Cardman wakes up over here every day and lusts for sexual contact with a kid. And

there's fifty, sixty times like what's she's saying. We don't want to hear that. But what is explainable and what people understand is . . . there was an accident, a momentary, one-time lapse and a bad decision occurred. People understand that, okay? What people don't understand is this guy over here who wakes up every day to wait 'til she's alone, 'til you're alone, to do those things. That guy is the one we're worried about. That's the guy that we try to send to prison and to lock up and that's what I want to eliminate here today. And, Ryan, I don't think you're that guy.[3]

(Emphasis added.)

¶ 127   While I do not have sufficient information before me to definitively make a determination of voluntariness, this record is sufficiently disturbing to mandate a remand for findings by the trial court on this critical question. In my view, the italicized portions of the interrogation that I reproduced above violate any constitutionally acceptable standard of police conduct and compel the conclusion that the police engaged in coercive conduct.

¶ 128   It is not a satisfactory answer that we do not review the voluntariness of Cardman's confession because he waived the issue.

---

[3] There is no transcript of the interview in the record and the audio recording is very difficult to understand. The excerpts I quote are my best approximation of what was said based on the audio recording.

Waiver is uniformly defined as an "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938)). There is no basis in this record to establish that Cardman knowingly and intelligently waived a challenge to the voluntariness of his inculpatory statements.

¶ 129 Criminal cases are not, or at least should not be, a contest to determine whether defense counsel has made errors that cause forfeiture of a defendant's critical constitutional rights. The pressure on defense counsel in criminal cases, particularly overworked public defenders, is immense. That is precisely the reason why the Colorado Supreme Court has adopted the doctrine of plain error review: to correct obvious fundamental errors that impair the reliability of a judgment of conviction.[4]

¶ 130 Put simply, the single most important legal question in this case is whether Cardman was coerced into confessing guilt. If he

---

[4] I do not quarrel with those cases that hold that strategic decisions made by defense counsel should not be subject to plain error review. *See, e.g., People v. Bondsteel*, 2015 COA 165, ¶ 129. But the failure to object to the admission of Cardman's confession on voluntariness grounds could not conceivably be viewed as a strategic decision.

was, and his inculpatory statements are suppressed under the Due Process Clause, there is a significant chance that the outcome of this case would have been different. Every other issue in this case pales in comparison.

¶ 131    While I do not contend that a trial court has a sua sponte duty to police every confession admitted into evidence, I also suggest it is difficult to dispute that the audio recording of Cardman's interrogation by the detective would and should at least raise serious questions in the mind of any judge regarding the tactics utilized by the detective, even without an objection by counsel.

¶ 132    I also question the majority's conclusion that Colorado law does not require a trial court (or this court) to consider the voluntariness of a confession even in the absence of a motion to suppress. In *Whitman v. People*, 170 Colo. 189, 193, 460 P.2d 767, 769 (1969), the Colorado Supreme Court held that

> [i]t is not necessary that there be an express objection by the defendant to the admission of the confession by a motion to suppress or by contemporaneous objection. The trial judge is required to conduct a hearing when it becomes evident to him that voluntariness is in issue. An awareness on the part of the trial judge that the defendant is questioning the

circumstances under which the statements were obtained is sufficient.

¶ 133   *Whitman* relied on similar language in *Jackson v. Denno*, 378 U.S. 368, 391-95 (1964).  In *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977), the United States Supreme Court repudiated that interpretation of *Jackson.*

¶ 134   In a later Colorado Supreme Court case relied on by the majority, *People v. Sanchez*, 180 Colo. 119, 122, 503 P.2d 619, 621 (1972), the court stated that "[w]e are not prepared to say that the mere act of offering the statement into evidence is sufficient to raise an issue of its voluntariness."  But *Sanchez* does not cite *Whitman,* and neither *Sanchez* nor any other Colorado Supreme Court case precludes plain error review in the circumstances presented by this case.

¶ 135   Casting further doubt upon the current status of Colorado law in this respect is *People v. Copenhaver*, where, twenty-three years after *Whitman,* a division of this court stated:

> Defendant did not contend in the trial court that either statement was involuntary or unreliable, nor did he request a hearing on these issues.  *Moreover, the record does not afford a basis for concluding that the voluntariness of the statements might be*

66

> *challenged.* In these circumstances, the court
> was not required to hold a hearing on
> voluntariness sua sponte.

21 P.3d 413, 418 (Colo. App. 2000) (emphasis added).

¶ 136    As I have previously observed, questions regarding the voluntariness of Cardman's statements were obvious when the audio recording of Cardman's second interrogation was played for the jury.

¶ 137    The majority recognizes that an appellate court reviews claims of unpreserved error for plain error in a wide variety of contexts. *People v. Vigil*, 127 P.3d 916, 929 (Colo. 2006). But in this critical context, the majority applies special rules supposedly applicable to suppression issues to preclude even plain error review.

¶ 138    The error in applying these special rules to preclude even plain error review is further illustrated by the distinction between two very different types of suppression issues commonly faced by courts. The first is a claim that the evidence obtained by the police — either physical evidence or inculpatory statements by a defendant — should be suppressed because the Fourth Amendment was violated in obtaining the evidence. *People v. Jorlantin*, 196 P.3d 258, 261 (Colo. 2008). Suppression of relevant evidence under the

Fourth Amendment has little to do with the reliability of the evidence; in most cases the evidence is highly reliable and probative of the defendant's guilt. *See Alderman v. United States*, 394 U.S. 165, 174 (1969). Nevertheless, for reasons having nothing to do with the reliability of the evidence, the United States Supreme Court has held that evidence obtained in violation of the Fourth Amendment usually must be suppressed in order to provide an enforcement mechanism for the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 236-37 (2011). Because reliability forms no part of this equation, the application of procedural rules requiring that such objections be made at a specific time, or else they are waived for all time, is justifiable.

¶ 139 The other type of suppression issue — the type presented here — is the admission of evidence that arguably violates the Due Process Clause because the statements made by an accused were not voluntarily made. *Effland v. People,* 240 P.3d 868, 877 (Colo. 2010). Unlike Fourth Amendment suppression, this type of suppression directly implicates the reliability of the conviction obtained. *Rogers v. Richmond,* 365 U.S. 534, 541 (1961).

¶ 140   It can no longer be denied that false confessions are a stain on our judicial system. *See, e.g.*, Richard A. Leo et al., *Promoting Accuracy in the Use of Confession Evidence: An Argument for Pretrial Reliability Assessments to Prevent Wrongful Convictions*, 85 Temp. L. Rev. 759, 766 (2013) ("[T]he problem of contamination is epidemic, not episodic, in cases of false confessions." (quoting Laura H. Nirider et al., *Combating Contamination in Confession Cases*, 79 U. Chi. L. Rev. 837, 849 (2012))).

¶ 141   For this reason alone, we should be very circumspect before allowing a procedural default to preclude all review of whether a defendant's inculpatory statements were made voluntarily or were coerced when the issue is raised by the admission of evidence either at a suppression hearing or at trial.

¶ 142   The daunting requirements for finding plain error eliminate any concern by the majority that such plain error review will overcome the rules of criminal procedure and lead criminal litigants to hold back claims of error at trial and then, when they lose, simply make the objections on appeal that they should have made at trial. As our opinions demonstrate, findings of plain error are few and far between, as they should be. *Hagos v. People*, 2012 CO

63, ¶ 23. But plain error review is essential to review convictions that are potentially unreliable because of a serious error in the trial court proceedings. Holding that plain error review is unavailable on something as central to the integrity of the truth-finding process as the voluntariness of a confession risks affirmation of convictions based upon false, and thus unreliable, confessions.

¶ 143 In the vast majority of cases in which there is an unsupported and unpreserved claim of involuntariness, there is virtually no possibility that an appellate court will find plain error. But this case is different. Here, the trial court knew precisely and the appellate record demonstrates the factual basis for the claim of involuntariness. Some of the details were spread before the trial court in the colloquy with the detective at the suppression hearing. The other sordid details were displayed when the prosecution played the audio recording of Cardman's second interrogation for the jury. The only thing missing in this case is the ultimate determination by the trial court, based upon all of the circumstances, whether Cardman's statements were involuntarily made, a determination that trial courts not infrequently are required to make on remand.

70

¶ 144 Reviewing the voluntariness issue for plain error, I would hold that, as a matter of law, the police engaged in coercive conduct. Therefore, I would remand to the trial court for a determination whether, under all of the circumstances, Cardman's confession was involuntary and thus inadmissible for any purpose. *People v. Freeman*, 668 P.2d 1371, 1378 (Colo. 1983). The majority's failure to do so leaves me with the firm belief that justice has not been done in this case and that the convictions which the court affirms may be unreliable.

### III. Conclusion

¶ 145 For these reasons, I respectfully dissent. I would reverse Cardman's convictions because he did not reinitiate the police contact. But even if he did, I would remand to the district court to determine, under the appropriate legal standard, whether Cardman's statements were voluntary or involuntary. If they were made involuntarily, they cannot be admitted for any purpose and Cardman would be entitled to a new trial.