The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
September 12, 2019

**2019COA144**

**No. 16CA1724, *People v. Leyba* — Criminal Law — Custodial
Interrogation — Miranda**

A division of the court of appeals holds that a defendant who
is being interrogated by a law enforcement officer may revoke his
request for an attorney by reinitiating discussion about the
investigation immediately after having made the request, and that
the defendant in this case did so.

COLORADO COURT OF APPEALS                                    2019COA144

_____

Court of Appeals No. 16CA1724
Adams County District Court No. 14CR3612
Honorable Thomas R. Ensor, Judge

_____

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Furmen Lee Leyba,

Defendant-Appellant.

_____

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE J. JONES
Román and Lipinsky, JJ., concur

Announced September 12, 2019

_____

Philip J. Weiser, Attorney General, Melissa D. Allen, Senior Assistant Attorney
General, Colleen Wort, Special Assistant Attorney General, Denver, Colorado,
for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Alan Kratz, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Furmen Lee Leyba, appeals the district court's judgment of conviction entered on jury verdicts finding him guilty of aggravated robbery and three counts of accessory to first degree murder.  Among other things, he argues that the district court erred by declining to suppress statements he made to police detectives during a two-hour interrogation after he invoked his right to counsel.  Because we conclude that the detectives stopped interrogating Leyba after he invoked his right to counsel and Leyba reinitiated the conversation about the investigation with the detectives, we affirm the district court's decision declining to suppress the statements.  Leyba's remaining contentions fail as well.  Accordingly, we affirm.

## I.    Background

¶ 2     Leyba and his fellow gang member Gabriel Flores went to a house where Jason Quijada, a known drug dealer, was staying.  There were six people in the house — Quijada; two juveniles who worked for Quijada; Quijada's girlfriend, Cherene Rivera; Joshua Williamson; and Pastor Estapa.  Flores spoke to Quijada and Quijada gave him a hypodermic needle.  A little while later, for reasons that are unclear, Flores shouted at Quijada and then shot

1

and killed Quijada and the two juveniles. He and Leyba then took from the house guns, a toolbox, and a curling iron box thought to contain money. Leyba drove away from the house with Flores. But when Flores realized the box didn't have any money in it, they returned to the house. Flores threatened the occupants with a gun and demanded that they give him drugs and money. When Estapa told Flores the police were on their way to the house, Flores left and he and Leyba again drove away.

¶ 3    Two days later, police officers tried to arrest Leyba. While Leyba unsuccessfully tried to flee, a gun fell out of his pants. That gun proved to be the one which had been used to kill the three victims. Detectives James Morgen and Casey Overton questioned Leyba for two hours. The interview was video-recorded.

¶ 4    The People charged Leyba with three counts of felony murder, three counts of aggravated robbery, three counts of accessory to first degree murder, and one count of accessory to commit aggravated robbery. Leyba's theory of defense was that he didn't know Flores was going to shoot anyone, and that after Flores did so, he only took things from the house and drove with Flores from,

back to, and again from the house because he was afraid Flores would harm him too.

¶ 5     The jury acquitted Leyba of felony murder, but found him guilty of one count of aggravated robbery of Quijada and three counts of accessory to first degree murder.

## II.    Discussion

¶ 6     Leyba raises four issues on appeal: (1) whether the district court erred by failing to suppress the video of his interview; (2) whether the district court erred by denying his request for an instruction on theft as a lesser nonincluded offense of aggravated robbery; (3) whether the district court erred by refusing to instruct the jury on the affirmative defense of duress for the aggravated robbery charge; and (4) whether the prosecutor engaged in misconduct requiring reversal.  We discuss these issues in turn.

## A.    Suppression

¶ 7     Leyba contends that the district court erred by denying his motion to suppress the video-recorded statements he made after he invoked his right to counsel because the detectives didn't honor his request for counsel.  We conclude that the court properly denied the motion, albeit for somewhat different reasons than those on which

the district court relied. *See People v. Aarness*, 150 P.3d 1271, 1277 (Colo. 2006) (an appellate court can affirm a district court's ruling on different grounds).

### 1. Additional Background

¶ 8    Detectives Morgen and Overton interviewed Leyba at a police station house. The video shows Detective Morgen asking Leyba his name, date of birth, and other background information before saying the detectives wanted to question him. The following exchange ensued:

> Morgen: Furmen, uh, we want to go through your advisement of rights. I would like you to come over here and look at this if you're willing?
>
> Leyba: Do I need my lawyer for this?
>
> Morgen: Are you asking for one or not?
>
> Leyba: Yeah.
>
> Morgen: Okay.
>
> Leyba: I don't know what you [inaudible] are doing, like you're just asking me a bunch of questions about my name and stuff; I haven't been told shit besides what I been seeing on the news and I don't know what the fuck you're talking about.
>
> Morgen: K, we're investigating a homicide that took place two days ago.

4

Leyba: I know all that I mean, I mean, obviously I was around the same crowd of people and all that so, I mean, but the person you guys already caught hasn't told you what you guys needed to know?  Why does everybody else keep putting people involved that didn't do shit.  There was more than just me there.  [Inaudible] been the only one that's sitting on me like a suspect or something, I didn't do shit wrong.

Morgen: So, I'll make this clear, are you willing to talk to me or go through this form and talk to me about this case or no?

Leyba: And I can ask for a lawyer anytime I start to feel uncomfortable?

Morgen: Yes, sir.

Leyba: All right.

¶ 9    Detective Morgen then asked Leyba to read through a form advising him of his *Miranda* rights and to sign in various places to waive those rights:

Morgen: Okay.  I need you to be able to fill this out though.  Okay?  So the first question is do you read, write, and understand English?  You answer "yes" or "no," please.  And just follow along.  If you have any questions, I'll be happy to answer 'em for you.

Leyba: I'm fucking stressed out, man.

Morgen: Okay.  So starting with number one, read this.  Okay?  Then read two, three, and four.  And after you get done with that, read

this. You agree to it, yes or no. Okay? Go ahead and sign, please. Okay. And then I need you to read this little paragraph here and if you agree to it, sign, date, and time, please. Okay.

Leyba then spoke with the detectives for about two hours.

¶ 10    Leyba moved to suppress his statements from the interview. At the hearing on the motion, Detective Morgen testified that he had intended to stop the interview when Leyba answered "Yeah" to his question "Are you asking for [a lawyer] or not?" but Leyba "kind of rambled on."

¶ 11    The district court denied the motion, finding that Detective Morgen adequately advised Leyba of his rights, Leyba didn't unequivocally invoke his right to counsel, and Leyba continued the conversation with the detectives (not the other way around).

## 2.    Standard of Review

¶ 12    Whether a district court erred by refusing to suppress evidence presents a mixed question of fact and law. *See People v. Bradshaw*, 156 P.3d 452, 455 (Colo. 2007). We defer to the court's factual findings if they are supported by the record but review the court's legal conclusions de novo. *Id.* at 455-56. Where the statements in question are recorded, and there aren't any disputed,

relevant facts, we are in as good a position as the district court to decide the issue.  *People v. Kutlak,* 2016 CO 1, ¶ 13; *People v. Madrid,* 179 P.3d 1010, 1014 (Colo. 2008).

### 3.    Applicable Law

¶ 13    To be sure, a suspect has a right to have counsel present during a custodial interrogation.  *See Miranda v. Arizona,* 384 U.S. 436, 444 (1966).  When a suspect unambiguously and unequivocally invokes his right to counsel during an interrogation, the police must scrupulously honor that request.  *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981).  Simply put, after invocation, police must stop interrogating the defendant until counsel has been made available to him or until the defendant voluntarily reinitiates communication with the police.  *Id.*  The purpose of this bright-line rule is to protect a defendant from being badgered or coerced into waiving his rights.  *Davis v. United States,* 512 U.S. 452, 458 (1994); *see also Smith v. Illinois,* 469 U.S. 91, 98 (1984) (per curiam) ("In the absence of such a bright-line prohibition, the authorities through 'badger[ing]' or 'overreaching' — explicit or subtle, deliberate or unintentional — might otherwise wear down the

accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.") (citations omitted).

¶ 14    In practice, we most often answer two questions when assessing whether the "'rigid' prophylactic rule" of *Edwards* applies: First, did the suspect unambiguously invoke his right to counsel; and second, did the suspect initiate the succeeding conversation and then knowingly and intelligently waive the right he previously invoked?  *Smith*, 469 U.S. at 94-95 (quoting *Fare v. Michael C.*, 442 U.S. 707, 719 (1979)).[1]  This case, however, raises the additional, subsidiary question implicit in the second: Did the law enforcement officer ever stop interrogating the suspect?  The framework for addressing these three questions is relatively clear.

¶ 15    A suspect unambiguously requests counsel if he "articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Davis*, 512 U.S. at 459; *see also Kutlak*, ¶ 23 (clarifying that an unambiguous invocation is one that a reasonable police officer *would* understand

---

[1] Leyba doesn't dispute on appeal that he knowingly and intelligently waived his rights.

to be a request for counsel, not one that *could* be understood as a request for counsel).  When determining whether a defendant unambiguously invoked his right to counsel, a court must consider "the totality of the circumstances," examining factors such as what was said, the questioner's and the suspect's demeanor and tone, the suspect's behavior, and the suspect's personal characteristics (such as age) and background.  *Kutlak*, ¶ 24.

¶ 16    When a suspect unambiguously invokes his right to counsel, interrogation must cease.  And "an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel."  *Smith*, 469 U.S. at 92.  Nor can "a valid waiver of that right . . . be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  *Edwards*, 451 U.S. at 484.  Even so, a defendant may waive his previously invoked rights by reinitiating the conversation with police.  *People v. Martinez*, 789 P.2d 420, 422 (Colo. 1990) (a request for counsel isn't "irrevocable").

¶ 17    In considering whether police *stopped* interrogating the suspect, we must keep in mind what, exactly, interrogation means in this context.  It means express questioning and "any words or

actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote omitted); *accord Madrid*, 179 P.3d at 1014. It therefore reflects "a measure of compulsion above and beyond that inherent in custody itself." *People v. Rivas*, 13 P.3d 315, 319 (Colo. 2000).

¶ 18     But an "officer's direct response to a question initiated by a suspect" generally doesn't constitute interrogation, "even though the suspect is in custody and has already invoked his right to counsel." *Id.*

¶ 19     To determine whether an officer's words or conduct amounted to interrogation, we again consider the totality of the circumstances, *People v. Bonilla-Barraza*, 209 P.3d 1090, 1094 (Colo. 2009), remembering that *Miranda* was concerned with the "interrogation environment" and the techniques police use to encourage a defendant to speak — whether or not those techniques involve actual questioning. 384 U.S. at 457.

¶ 20     If interrogation stopped, a defendant may "initiate[] further communication, exchanges, or conversations with the police," and

waive his rights under *Miranda*, subjecting himself to further interrogation. *Edwards*, 451 U.S. at 485; *see also People v. Cardman*, 2016 COA 135, ¶ 15, *cert. granted, judgment vacated, and case remanded on other grounds*, No. 16SC789, 2017 WL 1369883 (Colo. Apr. 10, 2017) (unpublished order). A defendant initiates further questioning when he "evince[s] a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). More specifically, while "merely a necessary inquiry arising out of the incidents of the custodial relationship" doesn't qualify as a reinitiation of the conversation, asking something like "[w]ell, what is going to happen to me now?" might. *Id.* In determining whether a defendant reinitiated communication, we consider the totality of the circumstances, including the suspect's background, experience, and conduct. *Martinez*, 789 P.2d at 422.

### 4.   Analysis

#### a.   Invocation

¶ 21   To start, contrary to the People's assertion and the district court's finding, we conclude that Leyba unambiguously invoked his

right to counsel by answering "Yeah" to the detective's question "Are you asking for [a lawyer] or not?"

¶ 22    The People argue that the district court correctly concluded, based on the totality of the circumstances, that Leyba's request was ambiguous. But Leyba's statements after he clearly invoked his right to counsel, on which the People rely, can't be used to transform his unequivocal request into an equivocal one. *Smith*, 469 U.S. at 100 (suspect's statements after an unequivocal invocation can't "be used to cast retrospective doubt on the clarity of the initial request itself"); *People v. Kleber*, 859 P.2d 1361, 1363-64 (Colo. 1993).

¶ 23    The People misread *Kutlak* in arguing otherwise. In *Kutlak*, the Colorado Supreme Court held that the defendant's question asking if the police could get his attorney "down here *now*, or . . . ?," considered in light of the uncertainty reflected in his demeanor and his experience with the criminal justice system, wasn't an unambiguous request for counsel. *Kutlak*, ¶¶ 27, 30. The defendant's subsequent statements didn't render that invocation ambiguous; rather, the alleged invocation itself wouldn't have put a

12

reasonable officer on notice that the defendant was exercising his right to have counsel present. *Id.* at ¶ 23.

¶ 24 In this case, in contrast, Leyba answered "Yeah" when asked if he wanted a lawyer. That was a clear invocation of his right to counsel. *See People v. Redgebol*, 184 P.3d 86, 99 (Colo. 2008) ("There is no question that Redgebol's answer of 'Yes, he would like a lawyer' to the question of 'Would you like a lawyer with you, while we talk today, or no?' is an unambiguous and unequivocal request for counsel."); *see also Smith*, 469 U.S. at 100 (the defendant unequivocally invoked his right when, upon being advised of his right to counsel and asked if he understood, he replied, "Uh, yeah. I'd like to do that"); *Garcia v. Long*, 808 F.3d 771, 778 (9th Cir. 2015) (the defendant unequivocally invoked his right to silence by saying "No," to the question "do you wish to talk to me?"); *United States v. Silknitter*, No. 1:05-CR-0423, 2006 WL 860064, at *4 (M.D. Pa. Apr. 3, 2006) (unpublished order) ("[The] Defendant's response,

13

'Yeah,' when [the detective] asked if he wanted an attorney was sufficient to unambiguously invoke his request for counsel.").[2]

¶ 25    So we must now determine whether the detectives stopped interrogating Leyba.

### b.    Interrogation

¶ 26    We conclude that the detectives did stop interrogating Leyba after he invoked his right to counsel.

¶ 27    Once Leyba invoked his right, Detective Morgen stopped questioning him.  He didn't volunteer information about the charges or next steps; he simply answered Leyba's inquiry about why the detectives wanted to talk with him, and did so directly, succinctly, and accurately.  *See Rivas*, 13 P.3d at 319 (an officer's responses to questions from a suspect aren't usually regarded as interrogation); *cf. Bradshaw*, 156 P.3d at 454 (officer failed to end the interrogation where, after the defendant invoked his right to counsel, he asked, "So, are you, are you telling me that this was consensual?").  Only after Leyba continued to discuss the incident — saying "[t]here was more than just [him] there," and asking why the person the police

---

[2] Detective Morgen testified that he understood Leyba wanted a lawyer by answering "Yeah."

14

already had in custody hadn't told the police everything they needed to know — did Detective Morgen ask Leyba if he was actually willing to speak. In the interim, all Detective Morgen said — in responding to Leyba — was "Okay" and "K, we're investigating a homicide that took place two days ago."

¶ 28    To the extent Leyba argues that a law enforcement officer must remain completely silent after a suspect invokes his right to counsel, no matter what the suspect says subsequently, he cites no authority for that proposition, we have found none, and this argument appears to be contrary to settled law. *See Rivas*, 13 P.3d at 320 (the detective's truthful responses to the defendant's inquiry after invocation didn't constitute interrogation). And we simply don't see any compulsion from Leyba's perspective in Detective Morgen's answers, demeanor, or actions. Nor do we see any "badgering" or attempts to convince Leyba to rescind his invocation that this "prophylactic" rule seeks to deter. *See Smith*, 469 U.S. at 94-95.

¶ 29    Thus, we conclude that Detective Morgen stopped interrogating Leyba. We must turn, then, to reinitiation.

15

### c.    Reinitiation

¶ 30    The remaining question is whether Leyba reinitiated the conversation by "evinc[ing] a willingness and a desire for a generalized discussion about the investigation[.]" *Bradshaw*, 462 U.S. at 1045-46.  We conclude that he did.

¶ 31    Relying on *People v. Bradshaw*, 156 P.3d 452 (Colo. 2007), and *Redgebol*, 184 P.3d 86, Leyba argues that he couldn't have reinitiated because his questions and statements occurred so soon after he invoked his right to counsel.  Both cases are distinguishable.

¶ 32    In *Bradshaw*, the officer never ended the interrogation.  156 P.3d at 459.  Rather, he asked a substantive question about the incident immediately after the defendant invoked his right to counsel.  Indeed, the supreme court also said, albeit in dictum, that "[h]ad [the officer] scrupulously honored Bradshaw's first request for an attorney and ended the interrogation, Bradshaw's question, 'What am I facing here?' may have qualified as a reinitiation." *Id.*

¶ 33    In *Redgebol*, the court concluded that the district court properly suppressed the defendant's statements because the defendant didn't knowingly and intelligently waive his rights due to

substantial misconceptions, errors in translation, and the defendant's cultural background and limited intelligence. 184 P.3d at 98-99. The court went on to address the People's argument that the defendant had reinitiated the discussion, pointing out that the "alleged reinitiation occurred within thirty seconds" of his invocation, and saying that "[t]he People cite no case law from this jurisdiction or any other where a court has held that a defendant invoked his right to an attorney, thus ending the questioning, and then reinitiated questioning in less than a minute." *Id.* at 99-100; *see also Kutlak*, ¶ 52 (Gabriel, J., dissenting). But we don't read *Redgebol* as creating a bright-line durational minimum before which a defendant cannot reinitiate the conversation. And it would be a mistake, we think, to do so.

¶ 34    The majority in *Redgebol* analogized the facts before it to those in *Bradshaw,* where the interrogation never ended. 184 P.3d at 100. The decision rested, then, on the detective's failure to stop interrogating the defendant. *Id.* Moreover, the United States Supreme Court's test for reinitiation doesn't include a time component. Rather, it is couched in terms of what the suspect said: Did the suspect "evince[] a willingness and a desire for a

17

generalized discussion about the investigation?" *Bradshaw*, 462 U.S. at 1045-46; *see also Michigan v. Mosley*, 423 U.S. 96, 102-04 (1975) (There is no "per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent. . . . Through the exercise of his option to terminate questioning [a defendant] can control the time at which questioning occurs . . . ."); *Bonilla-Barraza*, 209 P.3d at 1095.  While we don't discount the possibility that timing may be relevant, *see Bonilla-Barraza*, 209 P.3d at 1095 (timing is *a* factor), it shouldn't be dispositive, *id.* (no factor is conclusive), as reinitiation has much less to do with what the suspect intends than what the suspect says.

¶ 35      Consider the following hypothetical.  During interrogation, a suspect says, "I want to talk to a lawyer."  The officer says, "Okay," and starts to get up to leave.  The suspect immediately says, "Wait. I've changed my mind.  I want to talk to you about this thing before I talk to a lawyer."  Can there be any doubt that under *Oregon v. Bradshaw* that would constitute reinitiation by the suspect?  We think not, despite the lapse of so little time.

¶ 36    This hypothetical is not purely hypothetical.  For although the

*Redgebol* court hadn't been cited any case law finding reinitiation

"in less than a minute," such case law exists.

¶ 37    For example, in *United States v. Gonzalez*, 764 F.3d 159, 167

(2d Cir. 2014), the court found that the defendant reinitiated the

conversation after he invoked his right to remain silent where an

agent told him what would happen next (which wasn't

interrogation), the defendant immediately told the agents not to

leave and that he wanted to speak with them; the agents then went

over his rights extensively before interrogating him.  Similarly, in

*State v. Palacio*, 442 P.3d 466, 470, 473 (Kan. 2019), the court held

that the suspect reinitiated the conversation and waived his

previously invoked right to counsel where, immediately after the

suspect invoked his right, the officers told him what he was being

charged with and then got up to leave, and the suspect immediately

said, "I'd like to say something else."  *See also Shelly v. State*, 262

So. 3d 1, 15 (Fla. 2018) (immediately after invoking his right to

counsel, the defendant continued and reinitiated the conversation

by asking the detective to call his mom, whom the defendant

asserted was an alibi witness); *State v. Perez*, 731 N.W.3d 384,

2007 WL 822862, at *4-5 (Wis. Ct. App. Mar. 20, 2007) (unpublished table decision) (the defendant immediately withdrew his request for an attorney).

¶ 38 Thus, we conclude that the passage of a short period is not an insurmountable obstacle to a finding of reinitiation. Rather, immediate reinitiation is possible if the totality of the circumstances supports the conclusion that the defendant showed "a willingness and a desire for a generalized discussion about the investigation[.]" *Bradshaw*, 462 U.S. at 1045-46; *see Martinez*, 789 P.2d at 422.

¶ 39 In this case, Leyba invoked his right to counsel but then immediately continued the conversation. The video shows that Detective Morgen began to turn to the side as soon as Leyba invoked his right by saying "Yeah." But Leyba continued talking:

> I don't know what you [inaudible] are doing,
> like you're just asking me a bunch of questions
> about my name and stuff; I haven't been told
> shit besides what I been seeing on the news
> and I don't know what the fuck you're talking
> about.

These statements weren't "merely a necessary inquiry arising out of the incidents of the custodial relationship." *Bradshaw*, 462 U.S. at 1045-46. Instead, they indicated a desire to know about the

20

purpose of the questioning, to which the detective reasonably responded by telling him what he was investigating. And then Leyba said,

> I know all that I mean, I mean, obviously I was
> around the same crowd of people and all that
> so, I mean, but the person you guys already
> caught hasn't told you what you guys needed
> to know? Why does everybody else keep
> putting people involved that didn't do shit.
> There was more than just me there.
> [Inaudible] been the only one that's sitting on
> me like a suspect or something, I didn't do shit
> wrong.

He thereby volunteered general information about the incident and again indicated a willingness to talk about it. The detective had Leyba read through his rights. The video shows Leyba apparently reading the form and signing that he understood and waived his rights. Leyba also clarified that he would ask for a lawyer whenever he became uncomfortable.

¶ 40 We therefore conclude, considering the totality of the circumstances, that although Leyba invoked his right to counsel and interrogation then ceased, Leyba reinitiated the conversation and knowingly and intelligently waived his previously invoked right to counsel.

21

¶ 41    Accordingly, we conclude that the district court didn't err in denying Leyba's motion to suppress.

## B.    Theft Instruction

¶ 42    Leyba next contends that the district court erred by failing to instruct the jury on theft as a lesser nonincluded offense of aggravated robbery.  We aren't persuaded.

¶ 43    Leyba's counsel requested a jury instruction on theft.  The district court rejected it, concluding that, in light of the undisputed evidence showing the use of deadly force, there was no rational basis for the instruction.  Instead, the court instructed the jury on the lesser included offense of robbery.

¶ 44    We review whether the record contains sufficient evidence for a lesser nonincluded offense instruction for an abuse of discretion. *People v. Jimenez*, 217 P.3d 841, 870 (Colo. App. 2008).  If statutory interpretation is required, we review that de novo.  *People v. Wartena*, 2012 COA 12, ¶ 30.

¶ 45    A defendant is entitled to an instruction on a lesser nonincluded offense — "a lesser offense that requires proof of at least one element not contained in the charged offense" — "so long as a rational evidentiary basis exists to simultaneously acquit him

of the charged offense and convict him of the lesser offense." *People v. Naranjo*, 2017 CO 87, ¶¶ 15, 17.

¶ 46    We begin by contrasting aggravated robbery with theft. A person commits robbery if he "knowingly takes anything of value from the person or presence of another by the use of force, threats, or intimidation." § 18-4-301(1), C.R.S. 2018. "The gravamen of robbery is the application of physical force or intimidation against the victim *at any time during the course of a transaction* culminating in the taking of property from the victim's person or presence." *People v. Bartowsheski*, 661 P.2d 235, 244 (Colo. 1983) (emphasis added). "A person who commits robbery is guilty of aggravated robbery if during the act of robbery or immediate flight therefrom . . . [h]e is armed with a deadly weapon with intent, if resisted, to kill, maim, or wound the person robbed or any other person . . . ." § 18-4-302(1)(a), C.R.S. 2018. Theft differs from robbery (and therefore aggravated robbery) in that it is a taking "without authorization or by threat or deception"; the use of force is excluded from the definition. § 18-4-401(1), (5), C.R.S. 2018.

¶ 47    Leyba doesn't dispute that Flores shot and killed Quijada and the two juveniles during the incident, which culminated in the

23

taking of property from others. He argues, rather, that there was evidence that he didn't intend any violence and didn't know that Flores did. Thus, he says, there was ample evidence from which the jury could rationally have concluded that he only committed theft, not aggravated robbery. He is incorrect.

¶ 48 The undisputed evidence showed the use of force during the incident — Flores shot and killed three people. So if the jury was persuaded that Leyba (as a complicitor or directly) took property from persons at the house, there was no rational basis for acquitting him of robbery.[3] It follows that instructing the jury on the lesser nonincluded offense of theft would have been improper. *See People v. Villalobos*, 159 P.3d 624, 628 (Colo. App. 2006) ("Because robbery can be established over the 'course of a transaction,' and there was no evidence disputing the use of force in the last phase of the transaction to retain control of the victim's property, there was no evidentiary basis for instructing the jury on theft."); *see also People v. Buell*, 2017 COA 148, ¶¶ 23, 27 (evidence was sufficient to support aggravated robbery conviction where the

---

[3] As the People point out, Leyba either committed aggravated robbery or no charged crime at all.

defendant conceded that he committed theft and used a knife after taking the property), *aff'd*, 2019 CO 27; *People v. Delgado*, 2016 COA 174, ¶ 17 (force elements — or in the case of theft, nonelements — of robbery and theft negate each other) (*cert. granted* Dec. 11, 2017); *People v. Ramirez*, 18 P.3d 822, 827 (Colo. App. 2000) ("[T]he mere chance that a jury may reject uncontroverted testimony and convict on the lesser charge does not require the trial court to instruct the jury on the lesser charge.").

### C.  Duress Instruction

¶ 49    Leyba also contends that he was entitled to an instruction on the affirmative defense of duress for the aggravated robbery counts.[4]  The district court disagreed, and so do we.

¶ 50    "[T]o present an affirmative defense for jury consideration, the defendant must present 'some credible evidence' on the issue involving the claimed defense." *People v. Garcia*, 113 P.3d 775, 783-84 (Colo. 2005) (quoting § 18-1-407(1), C.R.S. 2018); *see People v. Newell*, 2017 COA 27, ¶ 21.  Whether a defendant met this burden is a question of law that we review de novo.  *Garcia*, 113

---

[4] Leyba asked for and received a duress instruction on the accessory to first degree murder counts.

25

P.3d at 784. When deciding whether a defendant was entitled to a requested instruction, we view the evidence in the light most favorable to the defendant. *Cassels v. People*, 92 P.3d 951, 955 (Colo. 2004). A defendant is entitled to an instruction if the record contains any evidence that could support a jury finding in his favor on the affirmative defense.

¶ 51    The defense of duress bars conviction of a person "based upon conduct in which he engaged at the direction of another person because of the use or threatened use of unlawful force upon him or upon another person, which force or threatened use thereof a reasonable person in his situation would have been unable to resist." § 18-1-708, C.R.S. 2018. Thus, for a defendant to be entitled to an instruction on duress, the record must contain some evidence that the defendant (1) faced an immediate threat of death or bodily injury; (2) had a well-grounded fear that the threat would be carried out; and (3) had no reasonable opportunity to escape the threatened harm. *People v. Preciado-Flores*, 66 P.3d 155, 163 (Colo. App. 2002). The defense doesn't "include every threat causing subjective fear or exculpate every defendant too weak to resist

26

threats against himself or another." *People v. Speer*, 255 P.3d 1115, 1119 (Colo. 2011).

¶ 52 Leyba argues that there was credible evidence showing that there was a specific and imminent threat that Flores would harm him. He points to his interview with the detectives, in which he repeatedly said that he didn't know if Flores was going to shoot him, and also to testimony from Flores's cellmate that Flores said he made Leyba drive the vehicle. But even viewing this evidence in the light most favorable to Leyba, we conclude that the record remains devoid of any evidence to support a finding that Flores, Leyba's fellow gang member, threatened him in the house or elsewhere. *See id.* (affirmative defense of duress requires a specific and imminent threat of injury).[5]

¶ 53 We therefore conclude that the district court didn't err in refusing to instruct the jury on the affirmative defense of duress for the aggravated robbery charges.

---

[5] We also observe that Flores wasn't always with Leyba when they were in the house.

27

## D.   Prosecutorial Misconduct

¶ 54     Lastly, Leyba contends that prosecutorial misconduct during closing argument requires reversal.  We don't see any misconduct.

¶ 55     In reviewing a claim of prosecutorial misconduct, we first determine whether the prosecutor's conduct was improper based on the totality of the circumstances, and, if so, we then determine whether reversal is warranted under the appropriate standard of review.  *Wend v. People*, 235 P.3d 1089, 1096-97 (Colo. 2010).  For issues preserved by timely, specific objection, we review for harmless error.  *Hagos v. People*, 2012 CO 63, ¶ 12.  For unpreserved issues, we review for plain error.  *Id.* at ¶ 14. Prosecutorial misconduct in closing argument rarely constitutes plain error.  *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010).

¶ 56     Leyba argues that in closing argument the prosecutor improperly (1) appealed to the sympathy of the jury and (2) misstated the law of complicity.  And, even if neither of these individual errors requires reversal, he argues that their cumulative effect does.

28

¶ 57     The prosecutor began his rebuttal closing argument by showing pictures of the victims, saying their ages and naming their family members.  Defense counsel objected that the prosecutor was pandering to the jurors' sympathies, and the court agreed.

¶ 58     Initially, we note that the court essentially sustained the objection.[6]  In any event, although a prosecutor may not "encourag[e] the jury to depart from its duty to decide the case on the evidence" by appealing to sympathy for the victim, *People v. Dunlap*, 975 P.2d 723, 759 (Colo. 1999), a prosecutor isn't barred from discussing the victims at all.  Nothing indicates that the prosecutor's statements were calculated to inflame the passions or prejudice of the jurors or ask them to determine guilt based on emotion rather than evidence.  *Cf. id.* (remarks encouraging the jury to "memorialize or pay tribute to the victims by its verdict" were improper).

¶ 59     Leyba also contends that the prosecutor misstated the law of complicity as to aggravated robbery:

_____

[6] Defense counsel didn't ask the court either to strike the statements or to tell the jurors to disregard them.

29

Complicity says "aided, abetted, or otherwise encouraged." What is not aiding, when you go back to the back room when someone's robbing somebody, running out of the house, driving the getaway car, finding out it's empty, waiting for him to come back and take off, grabbing things on the way out according to two people? What is not complicit about that?

We don't have to prove that Mr. Leyba ever shot anybody. We don't have to prove that he struck anybody. We don't have to prove that he robbed anybody. That is not our burden of proof.

This is a felony murder. This means if there was a Robbery or Aggravated Robbery and he was aware and complicit in it, people died.

If there was Aggravated Robbery, he's complicit, he's guilty of Aggravated Robbery, even if he's not the one that pulled the trigger.

We talked about this. You've got a bank robbery; you've got a guy sitting in the getaway car. You can't prove that guy was in the bank. You can't prove that that guy shot the bank teller.

You can prove he had a getaway car. He goes to trial for felony murder in that case. He aided, abetted, or otherwise encouraged with the same mental state as his co-conspirator, complicitor; and that's exactly what happened in this case.

¶ 60    Leyba argues that, by excluding the required mental state for

commission of the underlying offense and telling the jury that the

People didn't have to prove that he robbed anybody, the prosecutor effectively told the jury that the People didn't have the burden to prove every element of the crime. But Leyba ignores the context of these statements. *Domingo-Gomez v. People*, 125 P.3d 1043, 1051 (Colo. 2005) (in determining whether a prosecutor's statement was improper, we consider the context). The prosecutor explicitly mentioned mental state. And he also largely tracked the elements of complicity, arguing that they had been met in this case.

¶ 61 Because we don't find any prosecutorial misconduct, there is no cumulative effect requiring reversal.

### III. Conclusion

¶ 62 We affirm the judgment.

JUDGE ROMÁN and JUDGE LIPINSKY concur.