22CA2256 Peo v Itive 10-02-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA2256
El Paso County District Court No. 18CR6852
Honorable Robin Chittum, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kelly Itive,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE FREYRE
Pawar and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 02, 2025

Philip J. Weiser, Attorney General, Jessica E. Ross, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kira L. Suyeishi, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Kelly Itive, appeals his theft and criminal impersonation convictions.  We affirm in part, reverse in part, and remand with directions.

I.     Background

¶ 2     Beginning in early 2017, Deborah Davis began a romantic relationship online with a foreign man she believed to be named David Keith.  Over the course of eleven months, Davis and Keith were in constant contact through phone calls, emails, and texts, but they never met in person.  Davis believed she and Keith were in love and would spend the rest of their lives together.

¶ 3     During their virtual relationship, Keith asked Davis to send him money.  She did so through wire transfers, money sharing services, and gift cards.  Davis deposited the wire transfers into an account belonging to Itive, whom she believed to be Keith's uncle.  During their relationship, Davis sent Keith approximately $48,000-$72,000.  Their relationship ended in 2018.

¶ 4     Davis went to the police after discovering that the picture Keith had given her was of a person who did not exist.  Davis provided the officers with two names connected to her lost money:

1

David Cody Keith and Kelly Itive. Following an investigation, the police arrested Itive.

¶ 5 After Itive's arrest, officers played Davis a series of Itive's jail phone calls. Davis recognized Keith's voice in some, but not all, of the recorded phone calls.

¶ 6 At trial, Itive testified that he had never spoken with Davis in any capacity. He said his cousin had introduced him to Peter Godson, who was building an orphanage in Nigeria. Itive believed that Davis was the sister of one of Godson's associates. He also believed that Davis was transferring money to him to support the orphanage. According to Itive, Godson asked Davis to send Itive money in U.S. currency, and Godson would withdraw an equivalent amount from Itive's Nigerian bank account to avoid "los[ing] money [due] to the exchange rate." Itive testified that Godson eventually stopped depositing money into his U.S. bank account but continued taking money from his Nigerian bank account. Itive believed that he and Davis were both victims of a scam perpetrated by Godson.

¶ 7 A jury convicted Itive of theft under section 18-4-401(1) and (2)(h), C.R.S. 2025, along with criminal impersonation under section 18-5-113(1)(b)(II), C.R.S. 2025. Itive challenges his

convictions on three grounds: (1) insufficient evidence supports his theft conviction as a class 4 felony; (2) the trial court erred in admitting evidence from his Facebook profile; and (3) the prosecutor committed misconduct. He further contends that the cumulative effect of these errors requires reversal. We address each contention below.

## II. Theft

¶ 8    Itive contends that the trial court erroneously allowed the prosecution to constructively amend the complaint and information by aggregating multiple thefts into a single charge under section 18-4-401(1)(a). We agree and reverse in part.

### A. Additional Facts

¶ 9    The prosecution charged Itive as follows:

> Between and including March 1, 2017 and
> February 9, 2018, Kelly Itive unlawfully,
> feloniously, and knowingly, without
> authorization or by threat or deception,
> obtained, retained, or exercised control over; or
> knowing or believing it to have been stolen,
> received, loaned money by pawn or pledge on,
> or disposed of, a thing of value, namely:
> money, of Deborah Davis, with the value of
> twenty thousand dollars or more but less than
> one hundred thousand dollars, and intended
> to deprive Deborah Davis permanently of its

use or benefit; in violation of section 18-4-401(1)(a),(2)(h) . . . .

¶ 10     At trial, the prosecution introduced evidence of numerous transfers of monies from Davis to Itive and of numerous communications between Davis and Keith.  As relevant here, the largest single transfer of money was for $12,000.  Consistent with the complaint and information, the court instructed the jury as follows:

> The elements of the crime of theft are:
>
> 1. That the defendant,
>
> 2. in the State of Colorado, at or about the date and place charged,
>
> 3. knowingly,
>
> 4. received, loaned money by pawn or pledge on, or disposed of,
>
> 5. anything of value belonging to another that he knew or believed to have been stolen, and
>
> 6. intended to deprive the other person permanently of the use or benefit of the thing of value . . . .

¶ 11     Relatedly, section 18-4-401(4)(b) allows multiple thefts against the same person to be charged in a single count, with the value of the stolen items aggregated.  The prosecution did not charge Itive

4

under this subsection, nor did the court provide the jury with a corresponding instruction.

¶ 12    The jury convicted Itive of theft, finding that the value of "the thing involved in the theft" was between $20,000 and $100,000. Following the jury's verdict, the trial court entered a class 4 felony theft conviction based on the total amount of money Itive received from Davis.

### B.    Standard of Review and Applicable Law

¶ 13    In assessing the sufficiency of the evidence, we review the record de novo to determine whether the evidence was "sufficient in both quantity and quality" to sustain a conviction. *McCoy v. People*, 2019 CO 44, ¶ 63. In doing so, we view the evidence as a whole and in the light most favorable to the prosecution to determine if the evidence is "substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *McDonald v. People*, 2021 CO 64, ¶ 64 (quoting *People v. Harrison*, 2020 CO 57, ¶ 32). In applying this test, we give the prosecution the benefit of every reasonable inference that can be drawn from the evidence. *Id.*

¶ 14    As relevant in this case, a person commits theft "when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization" and "[i]ntends to deprive the other person permanently of the use or benefit of the thing of value." § 18-4-401(1)(a).

¶ 15    When a person commits multiple thefts against the same person "pursuant to one scheme or course of conduct, the thefts may be aggregated and charged in a single count, in which event they shall constitute a single offense, the penalty for which shall be based on the aggregate value of the things involved." § 18-4-401(4)(b).

¶ 16    We also review de novo whether a constructive amendment or a simple variance occurred. *See People v. Carter*, 2021 COA 29, ¶ 35. A constructive amendment occurs when a jury instruction "changes an essential element of the charged offense and thereby alters the substance of the charging instrument." *People v. Rediger*, 2018 CO 32, ¶ 48 (quoting *People v. Rodriguez*, 914 P.2d 230, 257 (Colo. 1996)). Itive did not preserve this claim, as his counsel did not alert the trial court to any alleged amendment between the charging document and the prosecution's aggregation of his thefts.

Therefore, even if a simple variance occurred, we will not reverse unless the error is plain. *See Bock v. People*, 2024 CO 61, ¶ 23. "An error is plain only if it is obvious, substantial, and so undermined the trial's fundamental fairness as to cast doubts on the reliability of the conviction." *Id.* at ¶ 24.

¶ 17      When interpreting a statute, "our primary purpose is to ascertain and give effect to the General Assembly's intent." *Pineda-Liberato v. People*, 2017 CO 95, ¶ 22. The starting point in this endeavor is to examine the plain meaning of the statutory language. *Marsh v. People*, 2017 CO 10M, ¶ 20. Consequently, if the language in a statute is clear and unambiguous, we give effect to its plain meaning and look no further. *Lewis v. Taylor*, 2016 CO 48, ¶ 20. Only if the statutory language is susceptible of more than one reasonable interpretation, and is therefore ambiguous, may we resort to extrinsic aids of construction to address the ambiguity and decide which reasonable interpretation to accept based on the legislature's intent. *Id.*

### C.    Analysis

¶ 18      Itive asserts that the prosecution constructively amended the complaint by arguing that his multiple thefts during the charged

period collectively exceeded the $20,000 threshold. He argues that because the prosecution did not charge him under the aggregated theft subsection, section 18-4-401(4)(b), it could not aggregate multiple thefts to reach the threshold set forth in subsection (2)(h). Applying the plain language of the statute, we agree.

¶ 19    The prosecution charged Itive under section 18-4-401(1)(a) and argued that his multiple thefts over the timeframe charged constituted a single act of theft. However, several discrete acts of theft can be charged as a single offense "only if they occurred 'pursuant to one scheme or course of conduct.'" *Bock*, ¶ 15 (quoting § 18-4-401(4)(b)). Here, the jury instruction did not require the jury to find that the thefts occurred as part of one scheme or course of conduct, thereby lowering the prosecution's burden of proof. Accordingly, we conclude that a constructive amendment occurred.

¶ 20    We now turn to whether reversal is required and recognize that constructive amendments do not constitute structural error, but they can broaden or narrow indictments and may or may not produce prejudice. *Id.* at ¶ 19. Based on the trial evidence, we conclude that the judgment must be reversed in part because the

8

court's instruction lowered the prosecution's burden of proof and thereby prejudiced Itive. *See Rediger*, ¶ 51 (reversing judgment where the constructive amendment lowered the prosecution's burden of proof).

¶ 21    However, because the trial evidence shows, and Itive does not dispute, that (1) the prosecution proved beyond a reasonable doubt that he committed theft with a value of $12,000, and (2) this amount constitutes a lesser included offense of theft in the amount of $20,000, we reverse Itive's conviction as a class 4 felony and remand the case with instructions for the trial court to enter a conviction for a class 5 felony and to resentence Itive accordingly. *See* § 18-4-401(2)(g); *Halaseh v. People*, 2020 CO 35M, ¶ 9 (explaining that an appellate court is authorized to enter judgment on lesser included offense).

### III.    Investigation Testimony

¶ 22    Itive next contends that the trial court erroneously admitted testimony about Itive's Facebook page and testimony concerning the investigative process that included the phrase "Nigeria[n] romance scam." He argues that the testimony constituted

impermissible hearsay, was irrelevant, and was unduly prejudicial. We discern no abuse of discretion.

## A. Additional Facts

¶ 23 Before trial, the court granted Itive's motion in limine precluding the parties from calling Itive a "scammer."

¶ 24 During trial, the prosecutor asked a detective to explain how the police identified Itive as their prime suspect. He testified that Davis gave the police two names — "David Cody Keith" and "Kelly Itive" — and identified Itive as Keith's uncle. The detective then conducted a Facebook search that returned a profile for a man named "Kelly *Itivre*." The detective testified:

> I also looked up the name on Facebook, and I didn't get an exact match, but I did get a similar name of Kelly Itivre, with like an r-e on the end instead of a v-e. And so looking at that Facebook page, it indicated that that person was from Nigeria. And so that kind of, I guess, turned on a light bulb in my head said [sic] I could be dealing with a Nigeria[n] romance scam, something that we frequently investigate.

¶ 25 Defense counsel objected and argued that the term "Nigeria[n] romance scam" was a mischaracterization of the evidence and unduly prejudicial. Counsel then asked the court to strike the

10

detective's testimony, to instruct the jury on the struck testimony, and to grant a mistrial. The court denied the motion. It noted that defense counsel had used the term "Nigeria[n] romance scam" during voir dire, and it found the detective's testimony relevant to the investigation.

¶ 26    In follow-up questioning, the detective clarified that no objective criteria for what constitutes a "Nigeria[n] romance scam" existed. The prosecution never referred to the "Kelly Itivre" Facebook page again.

### B.    Standard of Review and Applicable Law

¶ 27    The parties dispute preservation. The People agree that Itive preserved his prejudice argument, but they contend he did not preserve his hearsay and relevance arguments.

¶ 28    "Preservation is a threshold question" because "[w]e do not review issues that have been insufficiently preserved." *Rinker v. Colina-Lee*, 2019 COA 45, ¶ 22. We do not require "talismanic language" to preserve an issue for appeal. *Madalena v. Zurich Am. Ins. Co.*, 2023 COA 32, ¶ 50 (quoting *In re Estate of Owens*, 2017 COA 53, ¶ 21). Preservation only requires that the issue "be brought to the trial court's attention and the court must be given

11

the opportunity to rule on it." *Franklin D. Azar & Assocs. P.C. v. Ngo*, 2024 COA 99, ¶ 51.

¶ 29   We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Davis*, 2012 COA 56, ¶ 38. A court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.* We review a preserved evidentiary error under the nonconstitutional harmless error standard. *See Hagos v. People*, 2012 CO 63, ¶ 12 (reversal required if the error substantially influenced the verdict or affected the fairness of the trial proceedings). But we review an unpreserved error for plain error. *Id.* at ¶ 39. Plain error is error that affects a substantial right and is so clear cut and obvious that a competent trial court should be able to avoid it without the benefit of an objection. *Id.* To require reversal, plain error must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. *Id.*

¶ 30   We agree that this issue is preserved in part. During trial, Itive objected to the characterization of the case as a "Nigeria[n] romance scam" because of its prejudicial nature. However, the

record does not show a relevance or hearsay objection. Thus, we review those issues under the plain error standard.

¶ 31 Hearsay is a statement other than one "made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). Hearsay statements are generally inadmissible at trial unless an exception applies. CRE 802; *Vista Resorts, Inc. v. Goodyear Tire & Rubber Co.*, 117 P.3d 60, 66 (Colo. App. 2004). A statement is not hearsay, however, if it is not offered for the truth of the matter asserted but, rather, to show its effect on the listener. *See, e.g.*, *People v. Robinson*, 226 P.3d 1145, 1151-52 (Colo. App. 2009) (noting that informants' statements offered to show their effect on the listening police officers are not hearsay).

¶ 32 Evidence is relevant if it tends to make any fact of consequence more probable than it would be without the evidence. CRE 401. "All relevant evidence is admissible," CRE 402, but it may be excluded under CRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice." Unfair prejudice refers only to evidence that tends to cause a decision to be

made on an improper basis. *People v. Banks*, 983 P.2d 102, 105 (Colo. App. 1999), *aff'd on other grounds*, 9 P.3d 1125 (Colo. 2000).

¶ 33 Relevant evidence need not conclusively prove the proposition for which it is offered. *People v. Greenlee*, 200 P.3d 363, 366 (Colo. 2009). Instead, "it must in some degree advance the inquiry." *Id.* (citation omitted). In reviewing whether such evidence should have been excluded, we "must afford [it] the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected." *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995).

## C. Analysis

¶ 34 We discern no abuse of discretion in the admission of the detective's testimony for three reasons. First, defense counsel opened the door to the term "Nigeria[n] romance scam" and its derivatives by asking the jurors during voir dire whether they had heard of "Nigerian romance scams." Moreover, the detective admitted there were no objective criteria associated with the term, and Itive never disputed that Davis deposited money into his bank account. Given this undisputed connection between Itive and Davis, and the fact that the defense first introduced the contested

14

term, we conclude that this brief testimony was not unduly prejudicial.

¶ 35 Second, even assuming without deciding that the Facebook testimony constituted hearsay, we conclude it was admissible to show its effect on the detective and the investigation, rather than to prove that Itive was in fact a Nigerian scammer. Thus, we are not persuaded that *People v. Hamilton*, 2019 COA 101, requires a different result. The testimony was presented as part of the detective's account of how Itive came to be a suspect during the investigation and why the detective chose to conduct immigration and vehicle inquiries that eventually led to Itive. *People v. Abad*, 2021 COA 6, ¶ 52.

¶ 36 Third, defense counsel argued that the police did not do a thorough job investigating the case. Therefore, the testimony was relevant to counter this argument. *People v. Marks*, 2015 COA 173, ¶ 34 (finding evidence independently relevant to show police conducted a thorough investigation).

¶ 37 Accordingly, we discern no error in the admission of this testimony.

## IV.       Prosecutorial Misconduct

¶ 38     Itive next contends that the prosecutor's cross-examination of Itive on his Nigerian roots served only to prejudice the jury against him and thus constituted misconduct.  We are not persuaded.

### A.     Additional Facts

¶ 39     Throughout the trial, defense counsel argued that the detectives used Itive's Nigerian descent to make a hasty, prejudicial judgment that Itive fraudulently took Davis's money.  During voir dire, defense counsel questioned potential jurors about their knowledge of "Nigerian prince" scams and whether they had any ethnic bias.  During opening statements, defense counsel said Itive was born in Nigeria and that Nigerians "struggle because it's not the same kind of country as [the] United States."  During the detective's cross-examination, defense counsel asked whether he "knew that Nigerian people are notorious for running scams on people in the United States, [and whether Itive] turned into your prime suspect, right?"

¶ 40     Finally, Itive testified on his own behalf and claimed that, like Davis, he too was a victim of a scam originating from Nigeria.  He explained that he engaged in the transaction involving Davis

because he believed Nigerian restrictions on money transfers and the government documents he had been given were plausible reasons for Davis to transfer money into his account. Itive explained that people often had issues sending money to Nigeria because the money could get "hijacked" or the Nigerian government would try to stop potential fraud. Itive also said it was common practice in African countries to use gift cards to make online purchases. The following colloquy occurred on cross-examination.

> [Prosecutor]: Okay. Mr. Itive, just very briefly so the jury has an understanding of West African geography, where is Ghana in relation to Nigeria?
>
> [Mr. Itive]: Ghana is about — depending on where you are going to, is about 24 hours away from Nigeria. Depends on where you are. If you are in Delta state, it's about hours. If you are in Lagos, it's about 12 hours. If you are in Guinea, so it all depends.
>
> [Prosecutor]: Is Delta state where Abuja is?
>
> [Mr. Itive]: No, Abuja is in the capital.
>
> [Prosecutor]: Oh, it's in the capital. Okay. Where is Delta state in relation to Lagos or Abuja?
>
> [Mr. Itive]: So Delta state is like the south.

[Prosecutor]: Okay. And Ghana is west of Nigeria. You have to cross Benin and Togo to get there?

[Mr. Itive]: Yes

[Prosecutor]: Now, you testified on direct examination that if you are trying to send U.S. dollars to Nigeria, it's very hard to do because they are trying to stop fraud; is that correct?

[Mr. Itive]: Yes, sir.

[Prosecutor]: And that's because in West Africa fraud is a very big problem, is it not?

[Mr. Itive]: Depend on where you are, but it's a big case in West Africa, actually, yeah.

[Prosecutor]: Right. You periodically have to bribe police officers just to be able to cross borders, especially in places like Benin and Togo and Nigeria, or if you go further towards the west coast, places like Guinea and Sierra Leon [sic], right?

[Mr. Itive]: What do you mean, "bribe"? What do you mean by "bribe."

[Prosecutor]: Essentially, if you are traveling between these countries, you might not be able to cross even with a valid passport and a valid visa without having to bribe these particular — these police officers essentially who are working at the borders, correct?

[Mr. Itive]: What do you — not correct. I don't want to —

[Prosecutor]: Okay. So we know that fraud is prevalent. In fact, they have a whole name for people who commit frauds in Nigeria, but also just more generally in West Africa. They're called Yahoo Boys; isn't that correct?

[Mr. Itive]: Yahoo Boys it depends. There are different kind of Yahoo Boys. People that commit — they sell human parts, they are called Yahoo Boys, too. So I don't know what you're talking about Yahoo Boys, so you have to specify.

[Prosecutor]: Sure. But there are many people who perpetrate scams that are called Yahoo Boys, right?

[Mr. Itive]: Kidnappers in Nigeria are called Yahoo Boys as well.

[Prosecutor]: Okay. Yahoo Boys are named after the website Yahoo!, because that, for a long time, was a very prevalent email address used to perpetrate these scams; isn't that true?

[Mr. Itive]: No, that is not true.

¶ 41     Defense counsel did not object to this questioning. The prosecutor never referred to Itive's answers in closing arguments.

### B.     Standard of Review and Applicable Law

¶ 42     "Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion." *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005). We will not

disturb the trial court's rulings regarding such statements absent an abuse of that discretion. *People v. Strock*, 252 P.3d 1148, 1152 (Colo. App. 2010).

¶ 43    Since defense counsel did not object, the error is unpreserved, and we review for plain error. *See People v. Leyba*, 2019 COA 144, ¶ 55, *aff'd*, 2021 CO 54. Reversal under this standard requires that the misconduct be obvious and so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Walker*, 2022 COA 15, ¶ 28; *see also Domingo-Gomez*, 125 P.3d at 1053 (prosecutorial misconduct rarely constitutes plain error and only warrants reversal when it is "flagrantly, glaringly, or tremendously improper" (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997))).

¶ 44    When reviewing claims of prosecutorial misconduct, we conduct a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, if the comments were improper, we evaluate whether they warrant reversal according to the proper standard of review. *Id.*

¶ 45    In conducting this analysis, we consider the prosecutor's

alleged error in the context of the argument as a whole and in light

of the evidence before the jury.  *People v. Samson*, 2012 COA 167,

¶ 30.  A prosecutor is permitted to comment on the admitted

evidence and the reasonable inferences that can be drawn from the

evidence, employ rhetorical devices, and engage in oratorical

embellishment and metaphorical nuance.  *Id.* at ¶ 31.  And because

arguments delivered in the heat of trial are not always perfectly

scripted, we give the prosecutor the benefit of the doubt when their

remarks are ambiguous or simply inartful.  *Id.* at ¶ 30.

## C.    Analysis

¶ 46    We discern no misconduct in the prosecutor's cross-

examination for four reasons.

¶ 47    First, the questions were responsive to Itive's direct

examination testimony concerning Nigerian scams and his belief

that he was also a victim of such a scam.  *People v. Kraemer*, 795

P.2d 1371, 1377 (Colo. App. 1990) (The "defendant addressed the

subject . . . on direct examination, thus opening the door to cross-

examination thereon.  Therefore, the questions were not improper."

(citations omitted)); *see also People v. Liggett*, 114 P.3d 85, 87 (Colo.

21

App. 2005) ("[A] defendant who testifies in a criminal case may be cross-examined like any other witness regarding his or her credibility."), *aff'd*, 135 P.3d 725 (Colo. 2006); *People v. Marion*, 941 P.2d 287, 293 (Colo. App. 1996) (Cross-examination is permitted "on any matter germane to the direct examination."); *People v. Sallis*, 857 P.2d 572, 574 (Colo. App. 1993) (The rule on cross-examination "does not limit cross-examination to the same acts and facts to which a witness has testified on direct examination; rather, it must be liberally construed to permit cross-examination on any matter germane to the direct examination, qualifying or destroying it, or tending to elucidate, modify, explain, contradict, or rebut testimony given by the witness.").

¶ 48 Second, the prosecutor's questioning drew no objection from defense counsel, suggesting that it was not overly damaging or prejudicial in the moment. *See Domingo-Gomez*, 125 P.3d at 1054 ("The lack of an objection may demonstrate the defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." (citation omitted)).

¶ 49 Third, to the extent Itive argues that the cross-examination was xenophobic because it brought attention to Itive's ethnicity, we

22

disagree. While we are mindful that racial bias operates on multiple levels and may be subtle, we conclude that the prosecutor's questioning was prompted by Itive's own statements and was not designed to incite racial prejudice. *See Marion*, 941 P.2d at 293 (cross-examination is permitted "on any matter germane to the direct examination"); *Kraemer*, 795 P.2d at 1377.

¶ 50 Finally, we note that the trial court instructed the jury that its decision could not be based on prejudice or bias. Absent contrary evidence, we presume the jury understood and followed this instruction. *See Washington v. People*, 2024 CO 26, ¶ 31.

## V. Cumulative Error

¶ 51 Itive last contends that the cumulative effect of the trial court's alleged errors warrants reversal.

¶ 52 The cumulative error doctrine applies when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process." *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)). Because we have found no errors, we necessarily conclude that the cumulative error doctrine does not apply. *See People v. Villa*, 240 P.3d 343, 359

23

(Colo. App. 2009) (cumulative error analysis is required only when multiple errors have been identified).

## VI. Disposition

¶ 53 We affirm in part, reverse in part, and remand with instructions to vacate the class 4 felony theft conviction, enter judgment for theft as a class 5 felony, and resentence Itive accordingly.

JUDGE PAWAR and JUDGE YUN concur.